829 F.2d 967
 INDIAN COUNTRY, U.S.A., INC., and Muscogee (Creek) Nation,
Plaintiffs-Appellees, Cross-Appellants,
v.
STATE OF OKLAHOMA ex rel. the OKLAHOMA TAX COMMISSION and
the District Attorney of Tulsa County,
Defendants-Appellants, Cross-Appellees.
 Nos. 86-1819, 86-1832 and 86-1887.
 United States Court of Appeals,
Tenth Circuit.
 Sept. 22, 1987.
 
 M. Denise Graham, Asst. Dist. Atty., Tulsa, Okl., and Robert C. Jenkins, Atty. for State of Okl. ex rel. the Oklahoma Tax Com'n, for defendants-appellants, cross-appellees.
 John Echols, Echols & Echols, Inc., Tulsa, Okl., (Lorraine Echols, Echols & Echols, Inc., Tulsa, Okl., and Geoffrey M. Standing Bear, Geoffrey M. Standing Bear, P.C., Window Rock, Ariz., with him on the brief), for plaintiffs-appellees, cross-appellants.
 Before SEYMOUR and BARRETT, Circuit Judges, and BROWN,* District judge.
 SEYMOUR, Circuit Judge.
 
 
 1
 The Muscogee (Creek) Nation and Indian Country, U.S.A., Inc. (ICUSA) brought this suit for declaratory and injunctive relief against the State of Oklahoma in connection with the "Creek Nation Bingo" enterprise located on Creek Nation land known as the "Mackey site." Plaintiffs alleged that the State could not lawfully regulate Creek Nation Bingo on tribal land or require the collection and remittance of state sales taxes on bingo activity sales. The district court agreed, concluding that state regulation and taxation are preempted and impermissibly interfere with tribal sovereignty. Accordingly, the court enjoined enforcement of state bingo laws and the state sales tax. The court also dismissed ICUSA as a party, concluding that the Tax Injunction Act, 28 U.S.C. Sec. 1341 (1982), bars ICUSA's action to enjoin the collection of state taxes.
 
 
 2
 On appeal, the State contends that the Creek Nation lands are not "Indian country," and that even if they are, the State nevertheless has complete civil and criminal jurisdiction over the site, including the authority to regulate and tax Creek Nation Bingo activities. On cross-appeal, the Tribe and ICUSA contend that ICUSA should not have been dismissed from the suit.[1] We affirm in part and reverse in part.
 
 
 3
 This case involves the authority of the State of Oklahoma to regulate and tax certain bingo and bingo-related activities conducted on treaty lands still held by the Creek Nation. Although portions of our inquiry are guided by California v. Cabazon Band of Mission Indians, --- U.S. ----, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987), which held state regulation of Indian bingo on reservation land to be preempted, and by our conclusion that these lands are Indian country, this case presents additional issues arising from the unique history of relations between the United States and the "Five Civilized Tribes" in the former "Indian Territory."[2] Because of the complex history of the Indian Territory and the numerous federal laws governing the Indians of Oklahoma, we emphasize that our inquiry is limited to the State's authority with respect to bingo conducted on Creek Nation lands. We begin by reviewing briefly the status and history of the Creek Nation and its tribal lands, and the nature of the Creek Nation Bingo enterprise.
 
 I.
 BACKGROUND
 
 4
 A. Creek Nation and Relationship with Federal Government
 
 
 5
 The Creek Nation is a federally recognized Indian tribe located in what is today eastern Oklahoma. In 1979, the Creeks reorganized their tribal government under section three of the Oklahoma Indian Welfare Act, 25 U.S.C. Sec. 503 (1982), and adopted a new Creek Constitution, which was approved by the United States Department of the Interior. See Brief of Appellees, exh. C. The present constitution, like the 1867 constitution it replaced, organizes the tribal government into executive, legislative, and judicial branches.
 
 
 6
 The special government-to-government and protectorate relationship continues to exist between the Creek Nation and the United States. In 1943, long after the historical events that form the center of controversy in the present case, a unanimous Supreme Court stated that "Congress has not terminated that [guardianship] relation with respect to the Creek Nation and its members." Board of County Comm'rs v. Seber, 318 U.S. 705, 718, 63 S.Ct. 920, 927, 87 L.Ed. 1094 (1943); cf. Northern Arapahoe Tribe v. Hodel, 808 F.2d 741, 749-50 (10th Cir.1987) (federal protectorate and trust relationship with Indian tribes). The Court in Seber concluded that the Creek Nation "still exists," 318 U.S. at 718, 63 S.Ct. at 927, and that under the Oklahoma Indian Welfare Act of 1936, 25 U.S.C. Secs. 501-509 (1982), the Tribe was "authorized to resume some of its former powers," Seber, 318 U.S. at 718, 63 S.Ct. at 927.
 
 B. Creek Nation Lands in Oklahoma
 
 7
 During the eighteenth and early nineteenth centuries, the Creek Nation occupied a large domain within the present states of Alabama and Georgia. See A. Debo, The Road to Disappearance 3 (1979 revised reprint) (orig. publ. 1941) [hereinafter Road to Disappearance]. In the 1820's, the federal government adopted a policy to forcibly remove the Five Civilized Tribes from the southeastern United States and relocate them west of the Mississippi River, in what is today Oklahoma. See Harjo v. Kleppe, 420 F.Supp. 1110, 1119 (D.D.C.1976), aff'd sub nom. Harjo v. Andrus, 581 F.2d 949 (D.C.Cir.1978). In a treaty concluded in 1832, the Creeks ceded their eastern homelands to the United States, in exchange for lands west of the Mississippi River. See Treaty, Mar. 24, 1832, United States--Creek Tribe of Indians, 7 Stat. 366 (Treaty of 1832). Article fourteen of the treaty provided that
 
 
 8
 "[t]he Creek country west of the Mississippi shall be solemnly guarantied to the Creek Indians, nor shall any State or Territory ever have a right to pass laws for the government of such Indians, but they shall be allowed to govern themselves, so far as may be compatible with the general jurisdiction which Congress may think proper to exercise over them."
 
 
 9
 Id., art. 14, 7 Stat. at 368; cf. Choctaw Nation v. Oklahoma, 397 U.S. 620, 625-26, 90 S.Ct. 1328, 1332, 25 L.Ed.2d 615 (1970) (similar treaties with Choctaws and Cherokees). In a subsequent treaty regarding these lands, the United States agreed to grant "a patent, in fee simple, to the Creek nation." Treaty, Feb. 14, 1833, United States--Creek Nation, art. 3, 7 Stat. 417, 419 (Treaty of 1833); see also Woodward v. De Graffenried, 238 U.S. 284, 293, 35 S.Ct. 764, 768, 59 L.Ed. 1310 (1915) (patent issued to Creek Nation in 1852, vesting title in tribe).
 
 
 10
 In 1856, the Creeks agreed to cede to the Seminole Tribe a portion of their lands. See Treaty, Aug. 7, 1856, United States--Creek and Seminole Tribes, 11 Stat. 699 (Treaty of 1856). With respect to the lands still held by the Creek Nation, the United States guaranteed the "same title and tenure" as promised and secured under the 1832 and 1833 treaties. Id., art. 3, 11 Stat. at 700. The 1856 treaty reaffirmed that "no State or Territory shall ever pass laws for the government of the Creek or Seminole tribes of Indians," and the United States pledged that "no portion of either of the tracts of country defined in [the treaty] shall ever be embraced or included within, or annexed to, any Territory or State." Id., art. 4, 11 Stat. at 700.
 
 
 11
 Ten years later, following the Civil War, the Tribe was forced to cede the western portion of its domain. See Treaty, June 14, 1866, United States--Creek Nation, 14 Stat. 785 (Treaty of 1866). The Creek Nation retained title to its "reduced ... reservation," id., art. 9, 14 Stat. at 788, which was promised to be "forever set apart as a home for said Creek Nation," id., art. 3, 14 Stat. at 786. In consideration for the lands ceded, the United States promised monetary payments "to enable the Creeks to occupy, restore, and improve their farms, and to make their nation independent and self-sustaining." Id. at 786-87. The Creeks agreed to permit federal legislation as necessary to protect persons and property within Indian Territory, but the treaty provided that "said legislation shall not in any manner interfere with or annul their present tribal organization, rights, laws, privileges, and customs." Id., art. 10, 14 Stat. at 788. Finally, the United States reaffirmed and reassumed all consistent prior treaty obligations toward the Creek Nation. See id., art. 12, 14 Stat. at 790.
 
 
 12
 By the 1880s, however, assimilationist policies and the influx of whites into Creek territory resulted in pressure on Congress to extinguish tribal title, allot the land to individual Creeks giving them alienable title, dispose of "surplus" lands to non-Indians, and eventually create a new state. Subsequent agreements and federal legislation, intended to implement these plans, thus resulted in further reduction of the tribally-owned lands of the Creek Nation. Nevertheless, certain lands in eastern Oklahoma lying within the exterior boundaries of the 1866 Creek reservation are still owned by the Creek Nation pursuant to the patents and promises dating back to the treaties. It is a tract of that tribal land, on which Creek Nation Bingo is located, which is involved in the present suit.
 
 C. Creek Nation Bingo
 
 13
 The Creek Nation operates bingo games on a tribally-owned tract of treaty land known as the "Mackey site," containing approximately one hundred acres along the Arkansas River in Tulsa County, Oklahoma. Creek Nation Bingo, the enterprise itself, is managed by Indian Country, U.S.A., Inc. (ICUSA), a non-tribal entity. ICUSA manages the games pursuant to a "Management Agreement" made between it and the Tribe, and specifically approved by the Creek National Council and the federal Bureau of Indian Affairs. See rec., vol. V, at 143 (testimony of Nelson Johnson, Deputy Comm'r, Creek Nation Gaming Comm'n); Brief of Appellees, exh. 2-A.
 
 
 14
 The bingo operations are licensed by the Tribe, supervised by the Creek Public Gaming Commissioner, and required to comply with a comprehensive gaming ordinance enacted by the Tribe. Under the Management Agreement, ICUSA has agreed to submit to the jurisdiction of the Court of the Muscogee (Creek) Nation, which was established under Article VII of the 1979 Creek Constitution. The Agreement also contains a limited waiver of sovereign immunity by the Tribe for disputes arising between ICUSA and the Tribe.
 
 
 15
 The bingo games are open to the public. See rec., vol. V, at 251-52 (testimony of William Foster, Comm'r of Gaming, Creek Nation). Approximately ninety-five percent of the bingo players are residents of Oklahoma. See id. at 251-52, 274. Most are from the Tulsa area. See id. Although the enterprise keeps records of the residence of players, the general manager testified that he did not know what percentage of players are not Creek citizens. See id., vol. VI, at 455 (testimony of Gordon Sjodin, General Manager, Creek Nation Bingo). In addition to the bingo games themselves, the facilities contain food services for patrons. Creek Nation Bingo also sells bingo supplies and accessories.
 
 
 16
 Creek Nation Bingo provides a source of employment for members of the Creek Nation. Approximately eighty percent of its employees are Creeks, and approximately seventeen percent are members of other Indian tribes. Recent statistics indicate an unemployment rate among Creeks residing in eastern Oklahoma at twenty percent or higher. See id., vol. V, at 144 (testimony of Nelson Johnson); id., vol. IV, at 75-76 (testimony of Gary Breshears, Exec. Dir., Office of Admin., Creek Nation). Tribal revenues derived from Creek Nation Bingo are used to support tribal operations and tribal health and social services programs.
 
 
 17
 The State of Oklahoma licenses and regulates but does not prohibit bingo. See Okla.Stat. tit. 21, Secs. 995.1-995.18 (1981 & Supp.1986). It does, however, prohibit high-stakes commercial bingo. See Brief of Appellants, at 26. Neither the Creek Nation nor ICUSA has obtained a state bingo license for Creek Nation Bingo, which does not purport to operate in compliance with state law. The enterprise also does not collect state sales tax on bingo ticket sales nor on concessions or other sales.
 
 II.
 THE MACKEY SITE AS INDIAN COUNTRY
 
 18
 The district court concluded that the Mackey site, on which Creek Nation Bingo is located, is "Indian country", as defined in 18 U.S.C. Sec. 1151(a) (1982). Section 1151 defines Indian country to include "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation." Id. Sec. 1151(a). Although section 1151 by its terms defines Indian country for purposes of determining federal criminal jurisdiction, the classification generally applies to questions of both civil and criminal jurisdiction. See Cabazon, 107 S.Ct. at 1087 n. 5. Numerous cases confirm the principle that the Indian country classification is the benchmark for approaching the allocation of federal, tribal, and state authority with respect to Indians and Indian lands. See, e.g., id.; Solem v. Bartlett, 465 U.S. 463, 465 n. 2, 104 S.Ct. 1161, 1163 n. 2, 79 L.Ed.2d 443 (1984); DeCoteau v. District County Court, 420 U.S. 425, 427-28 & n. 2, 95 S.Ct. 1082, 1084 & n. 2, 43 L.Ed.2d 300 (1975); Kennerly v. District Court, 400 U.S. 423 (1971); Cheyenne-Arapaho Tribes of Oklahoma v. Oklahoma, 618 F.2d 665 (10th Cir.1980); see also Cohen's Handbook of Federal Indian Law 27-46 (R. Strickland ed. 1982) [hereinafter Cohen's Handbook] ("Indian country" usually the governing legal term for jurisdictional purposes); F. Cohen, Handbook of Federal Indian Law 5-8 (1942) ("Indian country" generally determines allocation of tribal, federal, and state authority). We note that the Supreme Court of Oklahoma has also recognized the importance of this classification:
 
 
 19
 "The touchstone for allocating authority among the various governments has been the concept of 'Indian Country,' a legal term delineating the territorial boundaries of federal, state and tribal jurisdiction. Historically, the conduct of Indians and interests in Indian property within Indian Country have been matters of federal and tribal concern. Outside Indian Country, state jurisdiction has obtained."
 
 
 20
 Ahboah v. Housing Auth. of the Kiowa Tribe, 660 P.2d 625, 627 (Okla.1983); see State ex rel. May v. Seneca-Cayuga Tribe of Oklahoma, 711 P.2d 77, 79-82 & n. 26 (Okla.1985) (recognizing relevance of Indian country classification in eastern Oklahoma, formerly Indian Territory).
 
 
 21
 The State contends on appeal that the Mackey site is not Indian country because it is not a "reservation," nor is the fee title held in trust by the federal government for the Creek Nation. For the reasons set out below, we conclude that under both historical and contemporary definitions, the Mackey site has retained its status as Indian country and land reserved under the jurisdiction of the federal government and the Tribe.
 
 
 22
 The term "Indian reservation" has been used in various ways to define Indian country. See generally Cohen's Handbook at 34-38. Gradually the term has come to describe "federally-protected Indian tribal lands," id. at 35 n. 66, meaning those lands which Congress has set apart for tribal and federal jurisdiction. Cf. Solem, 465 U.S. at 468-69, 104 S.Ct. at 1164-65 (Indian reservation historically considered coextensive with tribal ownership; subsequently term has been expanded in meaning). Thus, for purposes of defining Indian country, the term simply refers to those lands which Congress intended to reserve for a tribe and over which Congress intended primary jurisdiction to rest in the federal and tribal governments.
 
 
 23
 A formal designation of Indian lands as a "reservation" is not required for them to have Indian country status. See United States v. McGowan, 302 U.S. 535, 538-39, 58 S.Ct. 286, 288, 82 L.Ed. 410 (1938) (Congress' intent controls for determining Indian country; designation as a "colony" or "reservation" immaterial); see also United States v. Chavez, 290 U.S. 357, 364, 54 S.Ct. 217, 220, 78 L.Ed. 360 (1933) (Indian country includes "any unceded lands owned or occupied by an Indian nation or tribe"); cf. United States v. John, 437 U.S. 634, 649, 98 S.Ct. 2541, 2549, 57 L.Ed.2d 489 (1978) (trust status created "reservation"); Santa Rosa Band of Indians v. Kings County, 532 F.2d 655, 657 (9th Cir.1975), cert. denied, 429 U.S. 1038, 97 S.Ct. 731, 50 L.Ed.2d 748 (1977) (California rancherios are Indian reservations). Moreover, the past failure to challenge Oklahoma's jurisdiction over Creek Nation lands, or to treat them as reservation lands, does not divest the federal government of its exclusive authority over relations with the Creek Nation or negate Congress' intent to protect Creek tribal lands and Creek governance with respect to those lands. See John, 437 U.S. at 652-53, 98 S.Ct. at 2550-51; see also Ute Indian Tribe v. Utah, 773 F.2d 1087, 1089 n. 1 (10th Cir.1985) (en banc), cert. denied, --- U.S. ----, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986). "[I]t is Congress' intent that must govern our decision." Id.; cf. Solem, 465 U.S. at 479 n. 23, 104 S.Ct. at 1170 n. 23 (State courts assumed that opened areas of reservation fell within their general jurisdiction; Supreme Court held that reservation boundaries not diminished).
 
 
 24
 As recounted above, the country in the Indian Territory provided for the Creek Nation was granted to it in fee simple. The treaties between the United States and the Creek Nation expressly recognized and preserved the Tribe's title and its right of self-government over its lands, and explicitly promised that the Creek country would remain immune from state or territorial laws. See Treaty of 1866, arts. 10, 12, 14 Stat. at 788, 790; Treaty of 1856, arts. 3, 4, 15, 11 Stat. at 700, 703-04; Treaty of 1832, art. 14, 7 Stat. at 368.
 
 
 25
 Historically, it is clear that Creek Nation lands were Indian country, subject only to tribal and federal jurisdiction. See Trade & Intercourse Act, ch. 161, Sec. 1, 4 Stat. 729 (1834). The treaties of 1832 and 1833 promised the Creeks a country west of the Mississippi River that would be set aside for their nation, held under a communal fee title. The Treaty of 1866 provided that the "reduced ... reservation" retained by the Creeks was "forever set apart as a home for the Creek Nation." Arts. 3, 9, 14 Stat. at 786, 788. These tribally-owned lands were "devoted to Indian occupancy, ... validly set apart for the use of the Indians." United States v. Pelican, 232 U.S. 442, 449, 34 S.Ct. 396, 399, 58 L.Ed. 676 (1914) (defining Indian country); see John, 437 U.S. at 648-49, 98 S.Ct. at 2549 (Pelican formulation the "principal test"). In 1890, when Congress created Oklahoma Territory, the lands of the Five Civilized Tribes, including the Creeks, remained Indian Territory. See Oklahoma Territory Organic Act, ch. 182, Secs. 1, 29, 26 Stat. 81, 93 (1890). No territorial government was ever created in the reduced Indian Territory, and it remained subject directly to tribal and federal governance. See Jefferson v. Fink, 247 U.S. 288, 290-91, 38 S.Ct. 516, 517, 62 L.Ed. 1117 (1918); Southern Surety Co. v. Oklahoma, 241 U.S. 582, 584, 36 S.Ct. 692, 693, 60 L.Ed. 1187 (1916).
 
 
 26
 Because the "Constitution vests the Federal Government with exclusive authority over relations with Indian tribes," Montana v. Blackfeet Tribe, 471 U.S. 759, 764, 105 S.Ct. 2399, 2402, 85 L.Ed.2d 753 (1985), Congress has the authority to define "Indian country" broadly and to exclude state jurisdiction within the defined area. See United States v. Mazurie, 419 U.S. 544, 555, 95 S.Ct. 710, 717, 42 L.Ed.2d 706 (1975). Once Congress has set lands apart as Indian country, they remain so until Congress divests them of that character. In a related context, the Supreme Court has recognized that "only Congress can divest a reservation of its land and diminish its boundaries," and "[o]nce a block of land is set aside for an Indian reservation ... the entire block retains its reservation status until Congress explicitly indicates otherwise." Solem, 465 U.S. at 470, 104 S.Ct. at 1166 (citing United States v. Celestine, 215 U.S. 278, 285, 30 S.Ct. 93, 95, 54 L.Ed. 195 (1909)). Considering Congress' clearly expressed intent that Creek Nation lands be set apart for the Creeks and be immune from state laws, we believe that divestiture of that federal and tribal authority over these lands "would require an equally clear expression of congressional intent." Ute Indian Tribe, 773 F.2d at 1088; cf. Cohen's Handbook at 27 ("Indian tribal territory has always held a separate status under federal law"). In the present case, we need not decide whether the exterior boundaries of the 1866 Creek Nation have been disestablished.[3] Instead, because title to the Mackey site is still held by the Creek Nation, we need only decide whether Congress has explicitly acted to divest Creek tribal lands of their Indian country status and to divest itself of jurisdictional authority over such lands.
 
 
 27
 In the present case, the treaties effectively reserved these lands for the Creek Nation and promised immunity from state laws. The Treaty of 1866 explicitly referred to the retained lands as the "reduced Creek reservation." Art. 9, 14 Stat. at 788. Although the State points to various acts of Congress that preempted Creek tribal authority with federal authority and that reduced the tribal land base through allotment and the disposition of "surplus" lands, the State has shown us no act of Congress that explicitly--or even implicitly--divested the remaining Creek tribal lands of their Indian country status. To the contrary, the Oklahoma Enabling Act expressly preserved federal authority over Indians and their lands and property. See Oklahoma Enabling Act, ch. 3335, Sec. 1, 34 Stat. 267, 267-68 (1906); Tiger v. Western Inv. Co., 221 U.S. 286, 309, 31 S.Ct. 578, 584, 55 L.Ed. 738 (1911). Four years after statehood, the court in United States Express Co. v. Friedman, 191 F. 673 (8th Cir.1911), explicitly rejected the broad contention "that the portion of Oklahoma formerly called the Indian Territory ceased to be Indian country upon admission of Oklahoma as a state." Id. at 678-79. After reviewing the enabling act and the 1906 legislation continuing the tribal governments, the court noted that in 1910, the Five Civilized Tribes "in their tribal capacity owned about 3,000,000 acres or more of land," id. at 679, and concluded that "[i]t would indeed be difficult to show how this land ceased to be Indian country," id. In addition, we note that in 1924, seventeen years after statehood, Congress still referred to the lands of the Five Civilized Tribes as included in the generic category of "Indian reservations." See Act of May 29, 1924, ch. 210, 43 Stat. 244 (codified at 25 U.S.C. Sec. 398 (1982)) (provisions apply to "[u]nallotted land on Indian reservations other than lands of the Five Civilized Tribes and the Osage Reservation").
 
 
 28
 The unusual nature of Creek Nation title to the Mackey site does not alter our conclusion, contrary to the State's suggestion that Indian fee title and "reservation" status under section 1151(a) are somehow inconsistent. In United States v. Chavez, the Supreme Court recognized that the Pueblo of Isleta's "communal ownership of the full title in fee simple" is not an obstacle to federal protection of the Indian lands. 290 U.S. at 363, 54 S.Ct. at 219. Patented fee title is likewise not an obstacle to either reservation or Indian country status of Creek Nation lands. The federal government's role as guardian and protector of Creek lands was recognized by the Supreme Court long after Oklahoma became a state. See United States v. Creek Nation, 295 U.S. 103, 109, 55 S.Ct. 681, 684, 79 L.Ed. 1331 (1935). Indeed, it would be anomalous to adopt the State's position suggesting that the treaties conferring upon the Creek Nation a title stronger than the right of occupancy have left the tribal land base with less protection, simply because fee title is not formally held by the United States in trust for the Tribe.[4]
 
 
 29
 In summary, the Mackey site is part of the original treaty lands still held by the Creek Nation, with title dating back to treaties concluded in the 1830s and patents issued in the 1850s. These lands historically were considered Indian country and still retain their reservation status within the meaning of 18 U.S.C. Sec. 1151(a). The district court thus correctly concluded that in many respects the "Mackey site is the purest form of Indian Country; ... set apart for the use and benefit of the Creek Nation." Rec., vol. I, doc. 106, at 11.
 
 III.
 STATE AUTHORITY TO REGULATE CREEK NATION BINGO
 
 30
 The Supreme Court "has consistently recognized that Indian tribes retain 'attributes of sovereignty over both their members and their territory,' ... and that 'tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States.' " Cabazon, 107 S.Ct. at 1087 (quoting Mazurie, 419 U.S. at 557, 95 S.Ct. at 718, and Washington v. Confederated Tribes of the Colville Indian Reservation, 447 U.S. 134, 154, 100 S.Ct. 2069, 2081, 65 L.Ed.2d 10 (1980)); see New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 331-33, 103 S.Ct. 2378, 2384-85, 76 L.Ed.2d 611 (1983); see also State of Washington, Dep't of Ecology v. EPA, 752 F.2d 1465, 1469-70 (9th Cir.1985). There is a presumption against state jurisdiction in Indian country. See Cabazon, 107 S.Ct. at 1092 n. 18; see also Cheyenne-Arapaho Tribes, 618 F.2d at 668; cf. Montana v. United States, 450 U.S. 544, 557, 101 S.Ct. 1245, 1254, 67 L.Ed.2d 493 (1981); see generally C. Wilkinson, American Indians, Time, and the Law 93-106 (1987). Nevertheless the Court also has recognized that state laws may reach into Indian country "if Congress has expressly so provided." Cabazon, 107 S.Ct. at 1087. In addition, a state may validly assert such jurisdiction even absent express consent in very limited circumstances. See id. at 1091.
 
 
 31
 A. Pre-statehood Legislation and Enabling Act
 
 
 32
 The State contends that upon admission to statehood, it acquired complete jurisdiction over members of the Five Civilized Tribes and their lands within the former Indian Territory. The State relies on a combination of federal legislation enacted prior to statehood and language in the Oklahoma Enabling Act. Oklahoma contends that the enabling act required it to disclaim a proprietary but not jurisdictional interest in Indian lands. It also contends that because the state courts succeeded the special United States court in the Indian Territory with respect to certain cases, the state thereby acquired complete jurisdiction over Indians and their lands. We are not persuaded. We begin our discussion by reviewing the history and context of the legislation relied upon by the State.
 
 
 33
 As discussed earlier, following the Civil War the United States forced the Creek Nation to cede the western portion of its lands. See Treaty of 1866, 14 Stat. 785. As to the lands retained, the United States guaranteed the Creek Nation quiet possession, set the lands apart forever as the home of the Creek Nation, recognized the tribe's governmental authority, and reaffirmed all prior consistent treaty obligations. See id., arts. 1, 3, 10, 12, 14 Stat. at 786, 788-90. In 1867 the Creeks adopted a constitution and began rebuilding their nation within their reduced territory. See generally Road to Disappearance at 177-213. In 1890, they "exercised within a defined territory the powers of a sovereign people; having a tribal organization, their own system of laws, and a government with ... executive, legislative, and judicial [branches]." Turner v. United States, 248 U.S. 354, 355, 39 S.Ct. 109, 109, 63 L.Ed. 291 (1919).
 
 
 34
 During the 1880s and 1890s, the white population within the Indian Territory grew dramatically. See Harjo, 420 F.Supp. at 1121. As the number of whites in the territory increased, so did problems of lawlessness. The Indian courts of the Five Civilized Tribes only exercised jurisdiction over citizens of the tribe. Because the Indian courts did not have jurisdiction over noncitizen whites and the federal courts had only limited jurisdiction, serious problems developed in resolving criminal and civil disputes involving the Indians and these interlopers. See id. at 1121. Additionally, the white newcomers were frustrated by the communal tenure of the Indian lands, and pressured Congress to break up the tribal land base, attach freely alienable individual title to the land, and eventually create a new state. See id.
 
 
 35
 In 1889, Congress created a special federal court of limited jurisdiction in the Indian Territory, which at that time encompassed most of present-day Oklahoma. See Act of March 1, 1889, ch. 333, 25 Stat. 783. The following year, Congress carved the Territory of Oklahoma out of the western half of the Indian Territory. See Oklahoma Territory Organic Act, Sec. 1, 26 Stat. at 81. The lands in the east held by the Five Civilized Tribes remained Indian Territory, subject only to federal and tribal authority. See id. Sec. 29, 26 Stat. at 93. Because of continuing jurisdictional difficulties, Congress expanded the civil and criminal jurisdiction of the special United States court in the diminished Indian Territory. See id. Secs. 29, 30, 26 Stat. at 93-94. The act also provided that "certain general laws of the State of Arkansas ... which are not locally inapplicable or in conflict with this act or with any law of Congress ... are hereby extended over and put in force in the Indian Territory." Id. Sec. 31, 26 Stat. at 94-95. The tribes, however, retained exclusive jurisdiction over all civil and criminal disputes involving only tribal members, and the incorporated laws of Arkansas did not apply to such cases. See id. Sec. 30, 26 Stat. at 94.
 
 
 36
 In 1893, reflecting federal policies to forcibly assimilate Indians into the non-Indian culture and to eventually create a new state in the Indian Territory, Congress created the Dawes Commission to negotiate with the Five Civilized Tribes to extinguish tribal land title and develop an allotment plan. See Harjo, 420 F.Supp. at 1122. Six years earlier, Congress had passed the General Allotment Act of 1887, ch. 119, 24 Stat. 388, but had expressly exempted the Five Civilized Tribes, id. Sec. 8, 24 Stat. at 391. Because of the treaty-based fee patents held by these tribes, Congress initially believed that tribal consent was a prerequisite to individual land allotment. See Woodward, 238 U.S. at 294, 304-05, 35 S.Ct. at 768, 770-71.
 
 
 37
 The Five Civilized Tribes, however, refused to negotiate with the Dawes Commission, and Congress--still unsure of the scope of its authority to forcibly dispose of tribal lands--began to force the issue by placing restrictions on the Indian governments and expanding federal jurisdiction within Indian Territory. Prior to 1897, the Indian courts had exclusive jurisdiction over disputes involving members of the same tribe. In 1897, Congress enacted legislation providing that the body of federal law in Indian Territory, which included the incorporated Arkansas laws, was to apply "irrespective of race." See Appropriations Act of June 7, 1897, ch. 3, 30 Stat. 62, 83. In the same act, Congress broadened the jurisdiction of the federal courts, thus divesting the Creek tribal courts of their exclusive jurisdiction over cases involving only Creeks. The 1897 law also subjected Creek legislation to presidential veto, further restricting the authority of the Creek Nation to govern its territory and apply its laws. See id. at 84. A year later, the Curtis Act abolished the existing Creek court system and rendered then-existing tribal laws unenforceable in the federal courts. See Curtis Act, ch. 517, Secs. 26, 28, 30 Stat. 495, 504-05 (1898). This legislation, intended among other things to coerce the Creek Nation to agree to allotment and cession of tribal lands, federally preempted existing Creek laws, abolished the Creek courts, and made future Creek legislation subject to federal approval and oversight.
 
 
 38
 In 1901, the Creek Nation finally agreed to the allotment of tribal lands. See Original Creek Agreement, ch. 676, 31 Stat. 861 (1901); Supplemental Creek Agreement, ch. 1323, 32 Stat. 500 (1902). Although the vast majority of Creek Nation lands were allotted or sold, some lands remained in tribal ownership under the original treaty-based fee patents. In 1906, still envisioning the future dissolution of the tribal governments, Congress provided that upon such dissolution, title to the unallotted communal lands still held by the Five Civilized Tribes would pass to the United States in trust for the respective tribes. See Five Tribes Act of 1906, ch. 1876, Sec. 27, 34 Stat. 137, 148. In the same act, however, Congress expressly delayed any plans to terminate the tribes, and provided that the tribal governments "are hereby continued in full force and effect." See id. Sec. 28, 34 Stat. at 148; see also Harjo, 420 F.Supp. at 1129 (Congress extended tribal governments "over the strenuous objections of the Secretary of the Interior"). The legislation also continued to place restrictions on Creek legislative authority by requiring presidential approval of tribal legislation. See Five Tribes Act of 1906, Sec. 28, 34 Stat. at 148.
 
 
 39
 Two months after enacting the Five Tribes Act, Congress passed an enabling act to permit the people of the Oklahoma and Indian territories to form a state. See Oklahoma Enabling Act, ch. 3335, 34 Stat. 267 (1906); Enabling Act Amendment, ch. 2911, 34 Stat. 1286 (1907). The enabling act provided that federal Article III courts would succeed the special United States court in the Indian territory with respect to all cases arising under the Constitution, laws, or treaties of the United States. See Enabling Act Amendment, Sec. 1, 34 Stat. at 1286-87 (amending Sec. 16 of Oklahoma Enabling Act). The state courts created upon statehood were to succeed the Indian territory courts with respect to the remaining nonfederal cases. See id. Secs. 2, 3, 34 Stat. at 1287 (amending Secs. 17 and 20 of Oklahoma Enabling Act). The enabling act also provided that "the laws in force in the Territory of Oklahoma, as far as applicable, shall extend over and apply to said State." Oklahoma Enabling Act, Sec. 13, 34 Stat. at 275 (emphasis added). Finally, the enabling act preserved the authority of the federal government over Indians and their lands, and required the State to disclaim "all right and title" to such lands. See id. Secs. 1, 3, 34 Stat. at 267-68, 270.
 
 
 40
 Although the federal legislation described above seriously undermined the authority of the Creek Nation, we are not persuaded that Congress intended or acted to completely abolish Creek Nation jurisdiction over tribal lands, to divest the federal government of its authority, or to permit the assertion of jurisdiction by the State of Oklahoma.
 
 
 41
 In United States v. Ramsey, 271 U.S. 467, 46 S.Ct. 559, 70 L.Ed. 1039 (1926), the Supreme Court recognized that upon Oklahoma's admission to statehood in 1907, federal authority ended with regard to non-Indians. See id. at 469, 46 S.Ct. at 559. The Court also stated, however, that because of the unique relationship between the federal government and Indian tribes, federal authority continued with regard to Indians. See id. In the context of a case involving Creek allotted lands, the Supreme Court stated that "[i]n passing the enabling act for the admission of the state of Oklahoma ... Congress was careful to preserve the authority of the government of the United States over the Indians, their lands and property, which it had prior to the passage of the act." Tiger, 221 U.S. at 309, 31 S.Ct. at 584; see Oklahoma Enabling Act, Sec. 1, 34 Stat. at 267. Even in the Creek Allotment Agreement, Congress expressly reaffirmed prior consistent treaty obligations with the Creek Nation. See 31 Stat. at 872 (provision no. 44). Those obligations included the promise that the lands owned by the Creek Nation would be protected from state laws. Nothing in the supplemental allotment agreement or in subsequent legislation is inconsistent with the preservation of federal and tribal jurisdiction over these lands.
 
 
 42
 The State argues that the wording of the disclaimer contained in section three of the enabling act differs from disclaimers required of other states and evinces congressional intent to permit the state to assert broad jurisdiction over Indian lands. The relevant portion of section three of the Enabling Act reads as follows:
 
 
 43
 "That the people inhabiting said proposed State do agree and declare that they forever disclaim all right and title in or to any unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian, tribe, or nation; and that until the title to any such public land shall have been extinguished by the United States, the same shall be and remain subject to the jurisdiction, disposal, and control of the United States."
 
 
 44
 Oklahoma Enabling Act, Sec. 3, 34 Stat. at 270. The State asserts that section three required a disclaimer only of a proprietary interest in Indian lands, and reserves federal jurisdiction only for "public lands." The State points to enabling acts for other states that contain similar clauses, but which provide that "said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States." See, e.g., Act of Feb. 22, 1889, ch. 180, Sec. 4, 25 Stat. 676, 677 (enabling act for North Dakota, South Dakota, Montana, and Washington).
 
 
 45
 We reject the State's interpretation of Oklahoma's enabling act because the State's construction completely ignores the effect of section one of the act, in which Congress explicitly preserved federal authority. Section one provides that
 
 
 46
 "nothing contained in the said constitution shall be construed to limit or impair the rights of person or property pertaining to the Indians of said Territories (so long as such rights shall remain unextinguished) or to limit or affect the authority of the Government of the United States to make any law or regulation respecting such Indians, their lands, property, or other rights by treaties, agreement, law or otherwise, which it would have been competent to make if this Act had never been passed."
 
 
 47
 Oklahoma Enabling Act, Sec. 1, 34 Stat. at 267-68. Section one is a general reservation of federal and tribal jurisdiction over "Indians, their lands, [and] property," except as extinguished by the tribes or the federal--not state--government.
 
 
 48
 Sections one and three of the act, read in pari materia, cannot be read as a clear expression of congressional intent to disclaim federal or tribal jurisdiction over unallotted Creek tribal lands, such as those at issue in the present suit. Significantly, the enabling acts that the State attempts to distinguish from the Oklahoma Enabling Act contain no provision that parallels section one. See, e.g., Act of Feb. 22, 1889, 25 Stat. 676. The language of the Oklahoma act, read in its historical context, suggests that Congress intended to preserve its jurisdiction and authority over Indians and their lands in the new State of Oklahoma until it accomplished the eventual goal of terminating the tribal governments, assimilating the Indians, and dissolving completely the tribally-owned land base--events that never occurred and goals that Congress later expressly repudiated. The State has failed to cite any acts of Congress that clearly reveal an intent to divest the federal and tribal governments of jurisdiction over Creek tribal lands and to confer such authority on the State of Oklahoma.[5]
 
 
 49
 Our interpretation of Oklahoma's Enabling Act is consistent with the way in which Congress interpreted the act in 1953 when it addressed the matter of state jurisdiction over Indian country. In that year, Congress enacted Public Law 83-280 to permit states to assert limited civil and broad criminal jurisdiction in Indian country. See Act of Aug. 15, 1953, ch. 505, 67 Stat. 588 (Public Law 280) (codified as amended at 18 U.S.C. Sec. 1162, 25 U.S.C. Secs. 1321-26, 28 U.S.C. Sec. 1360 (1982 & Supp.1985)). Congress included a provision that operated to "give consent of the United States to those States presently having organic laws expressly disclaiming jurisdiction to acquire jurisdiction subsequent to enactment by amending or repealing such disclaimer laws." See S.Rep. No. 699, 83d Cong., 1st Sess., reprinted in 1953 U.S.Code Cong. & Admin.News 2409, 2412; see also Public Law 280, Sec. 6, 67 Stat. at 590 (codified as amended at 25 U.S.C. Sec. 1324). The Committee Report listed Oklahoma among the states with such disclaimers, and stated that the "[e]ffect of the disclaimer of jurisdiction over Indian land within the borders of these States--in the absence of consent being given for future action to assume jurisdiction--is to retain exclusive Federal jurisdiction until Indian title in such lands is extinguished." S.Rep. No. 699, 1953 U.S.Code Cong. & Admin.News at 2412; cf. McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 175, 93 S.Ct. 1257, 1264, 36 L.Ed.2d 129 (1973) (Court noted that Congress had acted on the assumption that the states lacked jurisdiction over the Navajos on their reservation). Creek Nation title to the Mackey site has never been extinguished.[6]
 
 
 50
 Finally, the State cites the Act of May 8, 1906, ch. 2348, 34 Stat. 182, which provided for the extension of state civil and criminal laws to Indian allottees at the expiration of the trust period restricting allotted lands. This act, however, was an amendment to the General Allotment Act, which by its terms did not apply to the Five Civilized Tribes. See General Allotment Act of 1887, Sec. 8, 24 Stat. at 391. The 1906 amendment, also by express language, did not apply to the "Indians in the Indian Territory." 34 Stat. at 183. We reject as without merit the State's attempt to limit the non-applicability of the 1906 amendment to one single provision (reservation of exclusive federal jurisdiction). Neither the 1906 amendment nor its subject matter--individual trust allotments--are relevant to the allocation of federal, tribal, and state jurisdiction over Creek tribal lands.
 
 
 51
 In sum, for whatever reasons, possibly including doubts about its own authority to dispose of Creek treaty lands absent Creek consent, Congress chose not to abrogate the Creek treaties outright. Instead of repudiating the treaties, Congress sought the voluntary relinquishment of Creek tribal title in order to effect a program of individual allotment, disposal of "surplus" lands, and preparation for statehood. Failing to induce the Creeks by negotiation to give up their tribal lands, Congress sought to force concessions by federally preempting Creek jurisdiction. The Creeks finally agreed to allotment and disposal of tribal lands. Whatever the jurisdictional provisions or implications of federal legislation with regard to the allotted tracts and those distributed to non-Indians, the history and legislation reveal no act by Congress to divest itself or the tribe (except by preemption) of authority over the remaining tribal lands, or to abrogate the treaty promises of immunity from state law on those lands. There is simply no clear evidence that Congress intended to relinquish federal and tribal authority prior to extinguishing tribal title or dissolving the tribal government. In Cabazon, the Supreme Court noted that "a grant to States of general civil regulatory power over Indian reservations would result in the destruction of tribal institutions and values." 107 S.Ct. at 1088. Although Congress at one time may have envisioned the termination of the Creek Nation and complete divestiture of its territorial sovereignty, the legislation enacted in 1906 reveals that Congress decided not to implement that goal, and instead explicitly perpetuated the Creek Nation and recognized its continuing legislative authority. See Harjo, 420 F.Supp. at 1121 n. 20 ("Congress did not intend here to divest the [Creek] National Council's power to legislate"). Congress subsequently repudiated its earlier policies of termination and enacted legislation designed to restore governmental powers to the Oklahoma tribes. See Oklahoma Indian Welfare Act, ch. 831, 49 Stat. 1967 (1936) (codified as amended at 25 U.S.C. Secs. 501-509 (1982)); Indian Reorganization Act, ch. 576, 48 Stat. 984 (1934) (codified as amended at 25 U.S.C. Secs. 461 et seq. (1982)); see also Seber, 318 U.S. at 718, 63 S.Ct. at 927. It is not for the courts to complete a task that Congress chose not to finish.
 
 
 52
 We conclude that the series of federal laws enacted prior to statehood and the Oklahoma Enabling Act do not divest the federal government of authority over Creek tribal lands, do not abolish the Creek Nation's legislative and regulatory authority over such lands, and do not evince a clear intent by Congress to permit the State to assert jurisdiction.
 
 
 53
 B. Balancing of Federal, Tribal, and State Interests
 
 
 54
 Even though we conclude that Congress did not expressly consent to Oklahoma's assertion of jurisdiction over Creek tribal lands, the Supreme Court has also recognized that "under certain circumstances a State may validly assert authority over the activities of nonmembers on a reservation, and ... in exceptional circumstances a State may assert jurisdiction over the on-reservation activities of tribal members." Cabazon, 107 S.Ct. at 1091 (quoting Mescalero Apache, 462 U.S. at 331-32, 103 S.Ct. at 2385). In the present case, however, three of the State's arguments have recently been rejected by the Supreme Court under similar circumstances. The State contends that it has regulatory authority over Creek Nation Bingo for the following reasons: (1) bingo is not a traditional tribal activity, (2) the tribe is "marketing an exemption" because the state does not permit high-stakes bingo, and (3) the state's interest outweighs the Tribe's interest because of the potential for organized crime. In Cabazon, the Court rejected these same arguments offered by the State of California. See id. at 1092-95.
 
 
 55
 First, with respect to high-stakes bingo not being a traditional tribal activity, the Court rejected the application of the principles of Rice v. Rehner, 463 U.S. 713, 103 S.Ct. 3291, 77 L.Ed.2d 961 (1983), to Indian bingo. Cabazon, 107 S.Ct. at 1094. In contrast to the regulation of liquor at issue in Rice, current federal policy promotes Indian bingo, and state regulation is preempted even if it is not a traditional tribal activity. Moreover, as the lower court in Cabazon concluded, we believe that the State's focus is too narrow. See Cabazon Band of Mission Indians v. County of Riverside, 783 F.2d 900, 906 (9th Cir.1986), aff'd, --- U.S. ----, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987).
 
 
 56
 "The focus in determining whether a tribal tradition exists should instead be on whether the tribe is engaged in a traditional governmental function, not whether it historically engaged in a particular activity. The Tribes in this case are engaged in the traditional governmental function of raising revenue. They are thereby exercising their inherent sovereign governmental authority."
 
 
 57
 Id. In the present case, we also note that at trial the Tribe produced evidence that the Creek Nation in fact historically did regulate gambling. See rec., vol. II, at 100 (testimony of Rennard Strickland).
 
 
 58
 The Court in Cabazon rejected the argument that the Tribe was marketing an exemption from state gambling laws, and distinguished Washington v. Confederated Tribes of the Colville Indian Reservation, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), as follows:
 
 
 59
 "In [Colville, id. at 155, 100 S.Ct. at 2082], we held that the State could tax cigarettes sold by tribal smokeshops to non-Indians, even though it would eliminate their competitive advantage and substantially reduce revenues used to provide tribal services, because the Tribes had no right 'to market an exemption from state taxation to persons who would normally do their business elsewhere.' We stated that '[i]t is painfully apparent that the value marketed by the smokeshops to persons coming from outside is not generated on the reservations by activities in which the Tribes have a significant interest.' Ibid. Here, however, the Tribes are not merely importing a product onto the reservations for immediate resale to non-Indians. They have built modern facilities which provide recreational opportunities and ancillary services to their patrons, who do not simply drive onto the reservations, make purchases and depart, but spend extended periods of time there enjoying the services the Tribes provide. The Tribes have strong incentive to provide comfortable, clean and attractive facilities and well-run games in order to increase attendance at the games.... [T]he Cabazon and Morongo Bands are generating value on the reservations through activities in which they have a substantial interest."
 
 
 60
 Cabazon, 107 S.Ct. at 1093-94.
 
 
 61
 The State's argument that its interest in preventing organized crime justifies imposition of its laws on Creek bingo was also rejected in Cabazon. In this case, as in Cabazon, the state does not prohibit all gambling. See id. at 1094. The Court recognized that although the potential for attracting organized crime "is surely a legitimate concern, ... we are unconvinced that it is sufficient to escape the pre-emptive force of federal and tribal interests apparent in this case." Id. at 1094; see also id. at 1092-93 & nn. 19, 20 & 21 (federal policies supporting tribal self-determination; opposing state regulation of Indian bingo). In addition, as the district court noted, the Creek Nation also has a substantial interest in preventing the infiltration of organized crime. See rec., vol. I, doc. 106, at 25 n. 19.
 
 C. Tribal Enterprise
 
 62
 The State asserts that Creek Nation Bingo is not a "tribal enterprise," and thus it and its manager ICUSA are not shielded from state regulation. We disagree. The district court found that
 
 
 63
 "Creek Nation Bingo is a tribal bingo enterprise owned, governed and controlled by the Muscogee (Creek) Nation. The tribal bingo enterprise was established by the Creek National Council and is controlled and supervised by the Muscogee (Creek) Public Gaming Commissioner. Muscogee Nation Public Gaming Ordinance, NCA-84-04 (March 9, 1984).
 
 
 64
 "Indian Country U.S.A., Inc., is a South Dakota corporation which serves as the general partner of the limited partnership Indian Country, U.S.A., a Limited Partnership # 1. It operates Creek Nation Bingo under a management agreement approved by the National Council, Ordinance NCA-84-07 (March 15, 1984), the Principal Chief and the Bureau of Indian Affairs. Under the agreement, Indian Country U.S.A., Inc., is the agent of the Nation in the day-to-day operations of the bingo enterprise. The agreement also provides that the profits of the enterprise are to be distributed between the tribe and the management company. Even though Indian Country U.S.A., Inc., provided the start-up capital for construction and development of the tribal bingo hall, under the agreement it is fully compensated for its management services and its venture capital investment.
 
 
 65
 "The court further finds the Creek Nation, with the federal government acting as trustee on behalf of the tribe, owns all of the real property associated with the enterprise, including the Mackey site, and all improvements thereon."
 
 
 66
 Rec., vol. I, doc. 106, at 12-13 (footnote omitted).
 
 
 67
 The evidence in the record amply supports the district court conclusion that Creek Nation Bingo is a "tribal enterprise." The Creek Nation retains full ownership rights over the land and facility and ultimate control over the bingo activities. Furthermore, whatever the specific arrangements for daily management control, return of capital, and distribution of profits, it is clear that the Creek Nation developed the bingo enterprise for the benefit of the tribe. It is also clear that benefits are in fact flowing to the tribe, in the form of both profits and employment. See rec., vol. IV, at 83 (testimony of Gary Breshears) (tribal bingo profits appropriated to health care); id., vol. VI, at 428 (testimony of Gordon Sjodin) (less than ten percent of Creek Nation Bingo employees had a prior job); id. at 427 (eighty percent of Creek Nation Bingo employees are Creeks).
 
 
 68
 The Bureau of Indian Affairs has approved the Creek Nation-ICUSA management contract. Particularly in light of federal policies encouraging tribal bingo enterprises, economic development, and substitution of private sector investment for federal economic assistance, the district court properly declined to give much weight to the fact that the Creek Nation has engaged non-Indian capital and expertise in developing and operating Creek Nation Bingo. Although this issue was apparently not raised in Cabazon, the bingo games there were characterized as "operated by non-Indian professional operators, who receive a percentage of the profits." Cabazon, 783 F.2d at 901; see also Seminole Tribe of Florida v. Butterworth, 658 F.2d 310, 311 (5th Cir.1981) (tribe contracted with private limited partnership to build and operate bingo hall on Indian reservation in exchange for percentage of profits as management fees), cert. denied, 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138 (1982). We thus agree with the district court that Creek Nation Bingo is a tribal enterprise and that its immunity from state regulation extends to ICUSA.[7]
 
 IV.
 SALES TAX
 
 69
 We next consider whether the State may impose a sales tax on the gross revenues of the tribal bingo enterprise and require the enterprise to collect and remit such a tax. The Supreme Court has recognized that a "State may sometimes impose a nondiscriminatory tax on non-Indian customers of Indian retailers doing business on the reservation." Colville, 447 U.S. at 151, 100 S.Ct. at 2080. In this context of transactions between Indian sellers and nonmember purchasers, the Court has upheld the imposition of state excise and sales taxes on cigarettes and tobacco products that were imported onto the reservation for resale. See California State Bd. of Equalization v. Chemehuevi Indian Tribe, 474 U.S. 9, 106 S.Ct. 289, 88 L.Ed.2d 9 (1985); Colville, 447 U.S. 134; Moe v. Confederated Salish & Kootenai Tribes, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976); see also Chemehuevi Indian Tribe v. California State Bd. of Equalization, 800 F.2d 1446 (9th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 2184, 95 L.Ed.2d 840 (1987). The case before us presents a different context in which to consider the reach of a state's taxing authority over transactions within Indian country involving tribal retailers. Cf. Chemehuevi, 800 F.2d at 1451 n. 2.
 
 
 70
 The district court recognized that the state sales tax statute provides that the legal incidence of the tax falls on the purchaser. See rec., vol. I, doc. 106, at 16. The court construed the tax code, however, to also impose the tax directly on a vendor tribe, because once the tax is collected from the consumer, the tribe becomes a "taxpayer" for purposes of enforcement and collection. Upon failure to collect and remit the tax, the vendor becomes personally liable and subject to penalties, interest, and liens on property. The court concluded that "to the extent that its sales tax laws operate to impose liability on the Creek Nation as a taxpayer, the State's authority is pre-empted by federal law." Rec., vol. I, doc. 106, at 14-15. Alternatively, the court held that "to the extent the State's tax ... [is] directed against activities created, sold and consumed on tribal lands, the State's authority interferes with the tribe's ability to exercise its sovereign functions." Id. at 15. Distinguishing the cigarette tax cases, the court concluded that in the present case, the Tribe's interests outweigh those of the State, and thus the tax is impermissible.
 
 
 71
 The State contends that the district court erred in treating the sales tax as placing direct tax liability on the tribe, arguing that the "legal incidence" of Oklahoma's tax clearly falls on the nonmember purchaser. In addition, the State argues that the tax is not preempted or otherwise impermissible, because the actual burden also falls on the purchaser. According to the State, imposition of the sales tax will not diminish tribal revenues and the collection requirements do not interfere with tribal self-government.
 
 
 72
 The Tribe contends that the Oklahoma sales tax places a direct tax burden on the Tribe as a "taxpayer" and is thus impermissible because Congress has not expressly given its consent. The Tribe further contends that the tax is preempted because it is imposed on a product created, sold, and consumed entirely upon tribal lands. The Tribe argues that the value of the product is generated on tribal lands, and involves activities in which it has a substantial interest. The Tribe suggests that imposition of the tax interferes with strong federal policies promoting Indian economic development. Thus, according to the Tribe, its strong interest outweighs the State's general interest in raising revenues.
 
 
 73
 We agree with the district court that the Oklahoma Sales Tax Code, Okla.Stat. tit. 68, Secs. 1350-1372 (1981 & Supp.1986), provides that the legal incidence of the tax falls on the consumer. We do not consider it appropriate, however, to treat the vendor liability provisions either as a direct "tax" or as a burden on the Tribe for purposes of determining the general validity of the sales tax and collection requirements. First, we note that the Washington state statute upheld in Colville also made a vendor personally liable upon failure to properly collect and remit the tax to the state. See Wash.Rev.Code Sec. 82.08.050 (1976), cited in Colville, 447 U.S. at 142, 100 S.Ct. at 2075. Second, these liability and sanction provisions are effectively triggered by noncompliance with the collection and remittance requirements. We do not believe that an otherwise valid tax is invalidated solely because of objectionable or impermissible provisions operating against the vendor that are triggered by the vendor's noncompliance.[8] Nevertheless, we agree with the district court's conclusion that the state tax is impermissible.
 
 
 74
 The federal government's exclusive authority over relations with Indian tribes, see Blackfeet Tribe, 471 U.S. at 764, 105 S.Ct. at 2402, and the quasi-sovereign status of tribes
 
 
 75
 "have given rise to two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members. First, the exercise of such authority may be pre-empted by federal law. Second, it may unlawfully infringe 'on the right of reservation Indians to make their own laws and be ruled by them.' [E]ither [barrier], standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members."
 
 
 76
 White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 142-43, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665 (1980) (citations omitted) (quoting Williams v. Lee, 358 U.S. 217, 220, 79 S.Ct. 269, 270, 3 L.Ed.2d 251 (1959)).
 
 
 77
 The preemption analysis applies a set of principles unique to Indian cases. See Bracker, 448 U.S. at 143-44, 100 S.Ct. at 2583-84. Ambiguities in federal law are construed in favor of the tribe, and preemption does not require an express congressional statement to that effect. See id. at 144, 100 S.Ct. at 2584. In Cabazon, the Court noted the general presumption that state laws do not apply within Indian country. See 107 S.Ct. at 1092 n. 18. That presumption, however, is not as strong in the context of the assertion of state authority over non-Indian activity on a reservation. See id. Thus, when a state "aserts authority over the conduct of non-Indians engaging in activity on the reservation," Bracker, 448 U.S. at 144, 100 S.Ct. at 2584, the Court has instructed us to engage in "a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." Id. at 145, 100 S.Ct. at 2584. Such an inquiry focuses on an examination of "the language of the relevant federal treaties and statutes in terms of both the broad policies that underlie them and the notions of sovereignty that have developed from historical traditions of tribal independence." Id. at 144-45, 100 S.Ct. at 2584. "State jurisdiction is preempted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority." Mescalero Apache Tribe, 462 U.S. at 334, 103 S.Ct. at 2386. For the reasons that follow, we conclude that the state's interest in taxing Creek bingo and related activities is minimal, and is incompatible with and outweighed by federal and tribal interests.
 
 
 78
 The treaties between the Creek Nation and the United States repeatedly promised to preserve and protect the Creek Nation's right of self-government and territorial immunity from state laws. See, e.g., Treaty of 1832, art. 14, 7 Stat. at 368; Treaty of 1856, arts. 4, 15, 11 Stat. at 700, 703-04; Treaty of 1866, arts. 3, 10, 12, 14 Stat. at 786, 788, 790. These express guarantees supplement and reinforce the usual preemption consideration that state laws not interfere with tribal interests and governance. In the present case, tribal and federal interests are particularly strong. The federal government has been heavily involved in promoting and assisting in the development of tribal bingo enterprises. See Cabazon, 107 S.Ct. at 1092-93. The Creek Nation's management agreement with ICUSA has been specifically approved by the Bureau of Indian Affairs, pursuant to 25 U.S.C. Sec. 81 (1982). Cf. Cabazon, 107 S.Ct. at 1093. The federal government has also adopted a position "strongly oppos[ing]" the imposition of state gambling regulations on Indian bingo. See id. at 1092 n. 21. Although this policy does not directly address the issue of state taxation, the state's attempt to tax bingo activities adds an additional burden to an enterprise in which the federal government opposes state interference. In Cabazon, the Court listed various statutes under which the Secretary of the Interior had financially assisted the Cabazon and Morongo Bands. Id. at 1093. The Creek Nation's reliance on capital investment from the private sector is perhaps even more in accord with current federal policies. See Brief of Appellees, at 18-19 (quoting 1983 Statement of President Reagan). Because the Creek Nation has sought to reduce its dependence on federal assistance and has utilized private sector investment in developing this tribal enterprise, we believe that the federal and tribal interests in maximizing tribal profits are particularly strong.
 
 
 79
 In Colville, the Court upheld the imposition of state sales and excise taxes applied to on-reservation Indian retail sales of cigarettes and tobacco products to nonmembers. See 447 U.S. 134, 100 S.Ct. at 2071. In so doing, the Court emphasized a number of crucial points. First, it was "painfully apparent that the value marketed by the smokeshops to persons coming from outside is not generated on the reservations by activities in which the Tribes have a significant interest." Id. at 155, 100 S.Ct. at 2082. Second, the Court noted that the taxes were "assessed against nonmembers of the Tribes and concern transactions in personalty with no substantial connection to the reservation lands." Id. at 156, 100 S.Ct. at 2082. The state tax was directed at cigarette and tobacco products that were simply imported onto the reservations for resale, and the underlying "product" of value was the claimed tax exemption itself, attracting customers who would normally do their business elsewhere.
 
 
 80
 This case is markedly different. Here, the "product" is a form of entertainment that is wholly created, sold, and consumed within the boundaries of Creek Nation lands. Patrons do not travel onto Creek lands to play bingo in order to avoid sales taxes. The Tribe does not "market an exemption from state taxation to persons who would normally do their business elsewhere," Colville, 447 U.S. at 155, 100 S.Ct. at 2082, because high-stakes bingo is not generally available within the state. Thus, Creek Nation Bingo does not undermine the state economy or tax base. The state is not losing tax revenues it would otherwise obtain from sales made outside of tribal boundaries. In fact, at trial the Tribe introduced evidence that the overall economic effect of Creek Nation Bingo on the state and local economy is positive. In contrast to the taxes in Colville and related cigarette cases, the state tax as applied to Creek Nation Bingo is directed solely at on-reservation value. Cf. id. at 157, 100 S.Ct. at 2083 (state interest strongest when tax directed at off-reservation value). The product of value is not a tax exemption, but the bingo games themselves, an activity with a substantial connection to the Creek Nation's lands. The Tribe has a very substantial interest in providing well-run entertainment to patrons and in furnishing "comfortable, clean and attractive facilites." Cabazon, 107 S.Ct. at 1094. The imposition of a sales tax would burden the tribal enterprise by increasing the total cost of playing bingo and by imposing collection, remittance, and recordkeeping requirements. Although these burdens alone might not serve to displace the tax,[9] we believe they are relevant when, as here, the state's own interest in taxing the on-reservation transaction is minimal.
 
 
 81
 The State has a general interest in raising revenue. That interest alone, however, is insufficient to justify taxing this tribal activity. See Mescalero Apache Tribe, 462 U.S. at 343, 103 S.Ct. at 2391. The State's interest is particularly minimal when it seeks to raise revenue by taking advantage of activities that are wholly created and consumed within tribal lands and over which it has no control. See Central Machinery Co. v. Arizona State Tax Comm'n, 448 U.S. 160, 174, 100 S.Ct. 2592, 2601, 65 L.Ed.2d 684 (1980) (separate opinion of Justice Powell).
 
 
 82
 The State also has a general interest in taxing its residents, for whom it provides services. Nevertheless, this interest is substantially diminished when the residents engage in activities largely beyond the state's jurisdiction and control, unless the activity or circumstances somehow undermine the state's ability to protect its economy and tax base. As already discussed, this is not the case with respect to Creek Nation Bingo. Moreover, the State has pointed to no services that it provides on Creek Nation lands that would justify the tax. Cf. Chemehuevi, 800 F.2d at 1449 (state provided substantial services on the reservation). In sum, although the state has a general interest in taxing its residents, we agree with the trial court that its interest is outweighed in this case by federal and tribal interests, and by the nature of the activity sought to be taxed.
 
 
 83
 We conclude that under the circumstances of this case, the application of Oklahoma's sales tax "is incompatible with federal and tribal interests reflected in federal law," Mescalero Apache Tribe, 462 U.S. at 334, 103 S.Ct. at 2386, and that the state interests at stake are not "sufficient to justify the assertion of state authority," id. The federal and tribal interests are particularly strong, and the treaties with the Creek Nation as well as traditional presumptions favor the exclusion of state law from Creek Nation lands. Most important, the product is created, sold, and consumed wholly within tribal boundaries, significantly reducing the state's interest. We therefore affirm the district court's decision holding the tax invalid.
 
 V.
 DISMISSAL OF ICUSA
 
 84
 The district court concluded that ICUSA was barred from seeking to enjoin enforcement of the state tax laws against Creek Nation Bingo. We agree that the Tax Injunction Act, 28 U.S.C. Sec. 1341 (1982), precludes ICUSA's claim against the Tax Commission. We also agree with the court that the dismissal of this claim will not affect the scope of relief, because all of the substantive issues can be reached by deciding the Tribe's claim challenging state taxation. Cf. Moe, 425 U.S. at 475 n. 14, 96 S.Ct. at 1642 n. 14.
 
 
 85
 We reverse, however, the district court's complete dismissal of ICUSA as a party. The Tax Injunction Act does not apply to ICUSA's action against the Tulsa County District Attorney to enjoin enforcement of the substantive state bingo regulations with respect to ICUSA's management of Creek Nation Bingo. Nor does the Eleventh Amendment bar ICUSA's suit against the District Attorney, because the claim alleges the violation of federal law and seeks only to enjoin the District Attorney's future conduct. See Edwards v. Valdez, 789 F.2d 1477, 1480-81 (10th Cir.1986).
 
 VI.
 CONCLUSION
 
 86
 We affirm the district court's judgment that the State's substantive bingo regulations and sales tax laws are preempted with respect to Creek Nation Bingo because they impermissibly interfere with tribal jurisdiction and federal laws and policies. We also affirm the dismissal of ICUSA's suit against the Oklahoma Tax Commission, but reverse the dismissal of ICUSA as a party. We reject as without merit or as unnecessary to the resolution of this suit any arguments raised by the parties that we have not discussed.
 
 
 87
 Affirmed in part and reversed in part.
 
 
 
 *
 Honorable Wesley E. Brown, Senior Judge, United States District Court for the District of Kansas, sitting by designation
 
 
 [1]
 The Tribe and ICUSA also contend that a related state court proceeding, brought by the State after this suit was filed and initially removed to federal court, was improperly remanded. The district court remanded the state action because it believed itself to be without jurisdiction. A district court order remanding a case as "removed improvidently and without jurisdiction," 28 U.S.C. Sec. 1447(c) (1982), is "not reviewable on appeal or otherwise," id. Sec. 1447(d), "whether erroneous or not," Thermtron Prods., Inc. v. Hermansdorfer, 423 U.S. 336, 343, 96 S.Ct. 584, 589, 46 L.Ed.2d 542 (1976). We are thus without jurisdiction to review this contention
 
 
 [2]
 The Cherokees, Chickasaws, Choctaws, Creeks, and Seminoles historically have been referred to as the "Five Civilized Tribes." Although most of what is today Oklahoma was once the "Indian Territory," after the creation of Oklahoma Territory in 1890, the phrase referred to the eastern portion of present-day Oklahoma encompassing the lands of the Five Civilized Tribes, plus lands of other tribes situated in the extreme northeastern corner of the state
 
 
 [3]
 The State seems to believe that the Indian country status of the Mackey site rests on whether the exterior boundaries of the 1866 Creek reservation have been disestablished. It does not. Our inquiry is narrower: whether Congress has divested the unallotted Creek tribal lands of their Indian country status. The disestablishment question is primarily important for determining the status of non-Indian lands, which remain Indian country under 18 U.S.C. Sec. 1151(a) until the surrounding portion of a reservation is disestablished. Tribal lands, trust lands, and certain allotted lands generally remain Indian country despite disestablishment. See, e.g., Solem, 465 U.S. at 467 n. 8, 104 S.Ct. at 1164 n. 8; DeCoteau, 420 U.S. at 428, 95 S.Ct. at 1085
 
 
 [4]
 The State takes the position that because the Creek Nation government was never terminated as had once been envisioned, fee title to tribal lands never formally passed to the United States "in trust" for the Tribe, as provided by the Act of April 26, 1906, Sec. 27, 34 Stat. 137, 148. See Brief of Appellants, at 11. Title in the Creek Nation, however, is not inconsistent with the evidence presented at trial that the federal government considers Creek tribal lands to be "trust lands." See, e.g., rec., vol. II, at 88, 107-08 (testimony of Rennard Strickland); id. at 112-13 (Bureau of Indian Affairs memo referring to unallotted Creek land as being held in trust by the United States)
 Regardless of who holds fee title, the United States has assumed certain obligations to protect and preserve Creek Nation lands. See, e.g., United States v. Hayes, 20 F.2d 873, 875 (8th Cir.1927) (United States, as guardian and trustee of Creek tribal property, brought suit on Tribe's behalf); see also United States v. Creek Nation, 295 U.S. 103, 109-110, 55 S.Ct. 681, 684, 79 L.Ed. 1331 (1935) (guardianship of the United States extends to Creek Nation's property and affairs); cf. United States v. Burnett, 777 F.2d 593, 596 (10th Cir.1985) (federal supervisory control the "essential quality" making Osage allotment "Indian country"), cert. denied, --- U.S. ----, 106 S.Ct. 1952, 90 L.Ed.2d 361 (1986). In addition, Indian tribal lands in general are protected against conveyance, absent congressional consent. See 25 U.S.C. Sec. 177 (1982); County of Oneida v. Oneida Indian Nation of New York State, 470 U.S. 226, 105 S.Ct. 1245, 1250, 84 L.Ed.2d 169 (1985); see also Mohegan Tribe v. Connecticut, 638 F.2d 612, 621 (2d Cir.1980), cert. denied, 452 U.S. 968, 101 S.Ct. 3124, 69 L.Ed.2d 981 (1981). It is thus clear that trust obligations assumed by the United States with respect to Indian lands are not inconsistent with fee title in the Tribe.
 
 
 [5]
 We again emphasize that we express no opinion regarding jurisdiction on allotted Creek lands or on other lands located within the 1866 reservation boundaries. We note, for example, that the Tribe does not concede that the State has complete jurisdiction on Creek allotments and individual trust lands. See rec., vol. V, at 258-59 (testimony of William Foster). That issue is not before us
 
 
 [6]
 We note that in 1953, Oklahoma officials took the position that Public Law 280 was not necessary for the state because Oklahoma already had full jurisdiction over Indians and their lands. See R. Strickland, The Indians in Oklahoma 76 (1980). In the present case, in addition to its statutory arguments, the State cites broad dicta in United States v. Hester, 137 F.2d 145 (10th Cir.1943), in support of its proposition that Oklahoma has "complete civil and criminal jurisdiction over all citizens residing within the state." Brief of Appellants at 12; see id. at 19. Of course, the present case does not involve, nor does the Tribe challenge, Oklahoma's jurisdiction over its Indian citizens outside of Indian country. Moreover, Hester involved the authority of the state to tax a restricted Indian allotment pursuant to a specific act of Congress passed in 1928
 Oklahoma's jurisdictional theory apparently dates back to the early days of statehood. At the time, state officials and non-Indian citizens attacked federal restrictions on the alienability of Indian property by arguing that once the Indians received United States and Oklahoma citizenship, the federal government lost its authority to treat them or their lands differently. See A. Debo, And Still the Waters Run 174-75 (1984 reprint) (orig. publ. 1940). That theory was rejected by the Supreme Court in Tiger, 221 U.S. at 311-12, 31 S.Ct. at 584-85. The State's 1953 position that Public Law 280 was unnecessary for Oklahoma and the broad conclusion suggested by its reading of Hester have been rejected by both federal and state courts. See, e.g., United States v. Burnett, 777 F.2d 593 (10th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1952, 90 L.Ed.2d 361 (1986); Ahboah v. Housing Auth. of the Kiowa Tribe, 660 P.2d 625 (Okla.1983); State v. Burnett, 671 P.2d 1165 (Okla.Crim.App.1983); C.M.G. v. Oklahoma, 594 P.2d 798 (Okla.Crim.App.), cert. denied, 444 U.S. 992, 100 S.Ct. 524, 62 L.Ed.2d 421 (1979); State v. Littlechief, 573 P.2d 263 (Okla.Crim.App.1978).
 
 
 [7]
 The State focuses too narrowly on whether a strict "master-servant" agency relationship exists between the Creek Nation and ICUSA, and suggests that only if ICUSA is such an "agent" can it be afforded immunity from state regulations. We are not persuaded. The preemption of state laws extends to the Creek Nation tribal bingo enterprise as a whole, which includes the involvement of non-Indians. Because we conclude that Creek Nation Bingo is a tribal enterprise, we need not address whether Creek sovereignty, Creek bingo regulations, and federal policies would also preempt state authority to regulate a purely non-Indian bingo enterprise conducted on Creek Nation lands. Cf. New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983) (comprehensive tribal regulatory scheme preempted state regulation of non-member hunting and fishing on the reservation)
 
 
 [8]
 Although we reject the district court's treatment of this issue in the context of this case, we do not imply that these provisions could be enforced against the Creek Nation as vendor. Because we hold that the sales tax is preempted, we need not decide the validity of the vendor delinquency provisions as applied to the Tribe
 
 
 [9]
 In a series of cases involving non-Indian sellers and tribal purchasers, the Supreme Court has held that the state tax levied upon the non-Indian party was nevertheless preempted because of the extensive federal involvement in the tribal activity and the fact that the economic burden of the tax was passed through to the tribe. See generally Ramah Navajo School Bd., Inc. v. Bureau of Revenue, 458 U.S. 832, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982); Central Machinery Co. v. Arizona State Tax Comm'n, 448 U.S. 160, 100 S.Ct. 2592, 65 L.Ed.2d 684 (1980); White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980). In the present case, the economic impact on the Tribe of adding the state sales tax onto the price of bingo games is perhaps more difficult to measure. That may often be the case, however, when a tribal enterprise acts as seller to non-member purchasers. In Colville, the state tax had a clearly adverse impact on the tribe because the tribe sought to generate revenues by imposing its own sales tax on private Indian retailers. Nevertheless, because the product was imported onto the reservation and the tribe did not have a substantial interest in the cigarette "smokeshops," the Court upheld the state tax. When tribes develop their own tribally-owned enterprises, however, and create a product on the reservation, there is no need or incentive to impose a separate tribal tax because tribal revenues are generated in the form of profits from sales. Thus, the greater the tribal interest and involvement, the less chance for a direct conflict between state and tribal taxes, as in Colville. Because we do not read the Supreme Court cases as reversing the traditional presumption against state authority in Indian country and creating a per se rule permitting state sales taxes on the on-reservation transactions between Indian retailers and nonmember purchasers, we conclude that our preemption analysis cannot turn on the severity of a direct economic burden on tribal revenues caused by the state tax