Dear Senate Haney
¶ 0 The Attorney General has received your letter asking for an official opinion addressing, in effect, the following questions:
 1. Is Senate Bill 759, 1992 Okla. Sess. Law, c. 339, which establishes procedures for collecting cigarette and tobacco product excise and sales tax on the sale of such products by Indian tribes, a "revenue raising bill" within the meaning of Article V, Section 33 of the Oklahoma Constitution?
 2. Do the provisions of 68 O.S. 349 (1992) impose a tax upon the sale of cigarettes by a tribe to members of the tribe?
 3. Do the disclaimer provisions of the Oklahoma Enabling Act pro hibit the State of Oklahoma from collecting cigarette and tobacco products sales and excise taxes on a tribe's sales of such products to non-tribal members?
 4. Does the collection of cigarette tax on the sale to non-tribal members, under the statutory scheme enacted in Senate Bill 759, place an unreasonable burden on commerce with Indian tribes?
 5. In view of Indian tribes' sovereign immunities, what are the mechanisms for the enforcement of collection of cigarette taxes under Senate Bill 759? Are these mechanisms feasible? And are they likely to result in extended litigation?
 I.
¶ 1 Oklahoma's "origination clause" is set forth at Article V, Section 33 of the Constitution, which provides:
 A. All bills for raising revenue shall originate in the House of Representatives. The Senate may propose amendments to revenue bills.
 B. No revenue bill shall be passed during the five last days of the session.
 C. Any revenue bill originating in the House of Representatives shall not become effective until it has been referred to the people of the state at the next general election held throughout the state and shall become effective and be in force when it has been approved by a majority of the votes cast on the measure at such election and not otherwise, except as otherwise provided in subsection D of this section.
 D. Any revenue bill originating in the House of Representatives may become law without being submitted to a vote of the people of the state if such bill receives the approval of three-fourths (3/4) of the membership of the House of Representatives and three fourths (3/4) of the membership of the Senate and is submitted to the Governor for appropriate action. Any such revenue bill shall not be subject to the emergency measure provision authorized in Section 58 of this Article and shall not become effective and be in force until ninety days after it has been approved by the Legislature, and acted on by the Governor.
(Emphasis added.)
¶ 2 This amended version of Article V, Section 33, was adopted at a special election held on March 10, 1992, when the people approved State Question No. 640. In amending article V, Section 33, the people continued to use the phrases "bill for raising revenue" and "revenue bill" — phrases used in that section prior to its amendment. These phrases have been considered and interpreted by the Oklahoma Supreme Court in many instances. The framers of the amendment are presumed to be conversant with the construction placed on these phrases and presumed to have intended to adopt the construction placed on the phrases by prior court decisions. See, Wimberly v. Deacon, 144 P.2d 447, 450
(Okla. 1944).
¶ 3 The most direct definition of a "revenue bill" was articulated in cases like Leveridge v. Oklahoma Tax Commission,294 P.2d 809 (Okla. 1956), where the Court held in its first syllabus that:
 "Revenue Bills" are those laws whose principal object is the raising of revenue and which levy taxes in the strict sense of the word, and said phrase does not cover laws under which revenue may incidentally arise.
(Emphasis added.)
¶ 4 This definition was reaffirmed by the Court in Board ofCounty Com'rs v. The Okla. Pub. Emp. Retire. Sys., 405 P.2d 68
(Okla. 1965), where the Court quoted the definition fromLeveridge and held, in its third syllabus, that:
 An Act of the Legislature in which revenue may incidentally arise, but whose principal object is not the raising of such revenue, does not come within the provisions of Article V, Section 33 of the Oklahoma Constitution requiring all revenue measures to originate in the House of Representatives.
¶ 5 The Oklahoma Supreme Court has applied this standard in a variety of circumstances over the years. A series of controversies involving Pure Oil Company and the Oklahoma Tax Commission is one example of the type of cases considered by the Court. The controversy between Pure Oil Company and the Tax Commission involved two cases taken to the Supreme Court. In the first case, Pure Oil Company v. Cornish, 52 P.2d 832 (Okla. 1935), Pure Oil Company argued that the tax laws which imposed taxes on various motor carriers engaged in "commercial enterprises," did not apply to Pure Oil Company because it was engaged in "industrial enterprises." The Supreme Court agreed.
¶ 6 A short time after the Court's decision, the Legislature responded by amending the law to impose the tax on "industrial" as well as "commercial" motor carriers. This time, in attacking the statute, Pure Oil Company, in Pure Oil Company v. OklahomaTax Commission, 66 P.2d 1097 (Okla. 1937), argued, among other things, that the act was a revenue raising measure adopted in violation of Article V, Section 33. In rejecting this argument, the Supreme Court stated in its third syllabus that:
 The real purpose of the challenged law, being to regulate the use of public highways, provision therein requiring payment of tax or license fee for use of highway in furtherance of industrial pursuits is only incidental to its real purpose, and the act is not a revenue raising measure such as to render it void under section 33, art. 5, of the Constitution of the state of Oklahoma[.]
¶ 7 As will be more fully discussed below, the principle object of Senate Bill 759 is the establishment of tax collection procedures.
¶ 8 Shortly after the State Constitution was adopted, the State Supreme Court considered whether a similar tax collection bill was a revenue raising bill, in Anderson v. Ritterbusch,98 P. 1002 (Okla. 1908). The bill in Ritterbusch provided for the discovery of property not listed for taxation, for its assessment and the collection of taxes thereon. A taxpayer challenged the law on several grounds, including the ground that it was a revenue raising bill and accordingly should have originated in the House, rather than in the Senate. In rejecting this argument, the Oklahoma Supreme Court first observed that the phrases "bills for raising revenue" and "revenue bills" are synonymous. The Court stated:
 It is obvious that the phrases "bills for raising revenue" and "revenue bills" are used in the same sense in the above section, and that the injunctions" All bills for raising revenue shall originate in the House of Representatives" and "No revenue bill shall be passed during the last five days of the session" are leveled at the same class of legislation.
98 P. at 1005 (emphasis added).
¶ 9 Then, discussing the bill more specifically, the Court noted that the State had a comprehensive revenue law for the purpose of raising money to defray the expenses of state, county and municipal government, and that if all property owners complied with the law's provisions, the burdens of the government would be appropriated equally and justly among the various taxpayers. The reality was, the Court observed, that unfortunately not all the taxpayers complied with the provisions of the law, and accordingly, the Legislature found it necessary to establish a means of assessing and collecting taxes, and such did not constitute a revenue raising bill:
 [T]he Legislature found it necessary to provide a means for reaching property which, through fraud or other means, was omitted from taxation, whereby such property and the owners thereof would be required to pay their just share of the burdens of government. To our minds such a law is in no sense a bill for raising revenue, although it may incidentally have that effect.
98 P. at 1007.
¶ 10 As noted above, the bill about which you inquire, Senate Bill 759, 1992 Oklahoma Sess. Law, c. 339, was enacted for reasons similar to those in Anderson v. Ritterbusch — to collect taxes — here, cigarette and tobacco taxes, owed on their sale by Indian tribes to non-tribal members.
¶ 11 In its efforts to collect excise tax and sales tax on the sale of cigarettes and tobacco products by Indian tribes to non-Indians, the Oklahoma Tax Commission sought to compel the tribes to collect the taxes and remit them, by bringing an action in the United States District Court. On appeal to the United States Supreme Court, in Oklahoma Tax Commission v. Citizen BandPotawatomi Indian Tribe of Oklahoma, 498 U.S. 111 S.Ct. 905,112 L.Ed.2d 1112 (1991), the United States Supreme Court held that the State of Oklahoma had the authority to tax sales of cigarettes to non-tribal members at the tribe's convenience store, but, because of the tribe's sovereign immunity, the State could not bring an action against a tribe in Federal district court to enforce that right. Then, the Supreme Court suggested various means — short of bringing action against the tribe — that might be available to the State for collecting such taxes:
 There is no doubt that sovereign immunity bars the State from pursuing the most efficient remedy, suit against the tribes but we are not persuaded that it lacks any adequate alternatives. We have never held that individual agents or officers of a tribe are not liable for damages in actions brought by the State. See, Ex parte Young, 209 U.S. 123, 52 L.Ed 714, 28 S.Ct. 441 (1908). And under today's decision, States may of course collect the sales tax from cigarette wholesalers, either by seizing unstamped cigarettes off the reservation, Colville, supra, at 161-162, 65 L.Ed.2d 10, 100 S.Ct. 2069, or by assessing wholesalers who supplied unstamped cigarettes to the tribal stores, City Vending of Muskogee, Inc. v. Oklahoma Tax Comm'n, 898 F.2d 122 (CA10 1990). States may also enter into agreements with the tribes to adopt a mutually satisfactory regime for the collection of this sort of tax. See, 48 Stat 987, as amended, 25 U.S.C.A. 476, 25 USCS 476. And if Oklahoma and other States similarly situated find that none of these alternatives produce the revenues to which they are entitled, they may of course seek appropriate legislation from Congress.
111 S.Ct. at 912 (emphasis added).
¶ 12 The Legislature, in enacting Senate Bill 759, adopted some of the collection methods suggested by the United States Supreme Court in the Citizen Band case. This, in part, is demonstrated by the Legislative findings, particularly Legislative Finding 3, that precede the substantive provisions of Senate Bill 759:
 The Supreme Court of the United States, in "Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe of Oklahoma," suggested that a state may provide other methods of collection of state taxes on sales of cigarettes and tobacco products made by Indian tribes or nations to persons who are not members of the tribe or nation, such as entering into mutually satisfactory agreements with Indian tribes or nations.
68 O.S. 346(A)(3) (1992).
¶ 13 In providing for the collection of cigarette excise tax and sales tax, Senate Bill 759 provides for tax compacts between the tribes and the Governor on behalf of the state. 68 O.S. 346
(1992). Under such a compact: (1) the tribe would make an agreed upon payment in lieu of cigarette sales and excise taxes; (2) cigarettes and tobacco products sold by the tribe would bear "payment in lieu of tax" stamps; (3) records of all sales to the tribes and nations would be required to be kept by wholesalers doing business with the State; and, (4) copies of invoices of wholesale sales to tribally owned or licensed retail stores would be required to be forwarded, by the wholesaler, to the Oklahoma Tax Commission. Id.
¶ 14 The law provides that tribes which do not enter into compacts will make a payment in lieu of cigarette and tobacco product sales and excise tax. The amount of the "in lieu of payment" is 75% of the tax that is otherwise imposed by law. 68O.S. 349 (1992). This 25% reduction in taxes was designed to insure that no tax would be imposed upon sales to tribal members. Accordingly, the collection scheme assumed that 25% of the sales by the tribe or their licensee would be to tribal members. If, in fact, more than 25% of the sales were to tribal members, the statute specifically provides for a refund to the tribe, upon the tribe providing sufficient documentation that sales of cigarettes to tribal members exceeded 25% of its total sales. Id. at subsection B.
¶ 15 As part of this collection system from tribes who had not entered into a compact, tax stamps evidencing payment of the in lieu of tax are required to be affixed to cigarettes and tobacco products sold by the tribes. 68 O.S. 349(C) (1992). Additionally, under the collection regimen, it is unlawful for any person knowingly to ship, transport, receive, possess, sell, distribute or purchase contraband cigarettes. 68 O.S. 349(D) (1992).
¶ 16 "Contraband" cigarettes are defined to mean "unstamped cigarettes" which are required to "bear stamps and which are in the possession, custody or control of any person, for the purpose of being consumed, sold, offered for sale or consumption or transported by any person in this state other than a wholesaler licensed under Section 304 of Title 68.n They do not, however, include "unstamped cigarettes sold to veterans' hospitals, to state-operated domiciliary homes for veterans or to the United States for sale or distribution by said entities." 68 O.S.348(7) (1992).
¶ 17 A reading of Senate Bill 759 in its entirety, and particularly those sections codified at 68 O.S. 346 — 68 O.S.352 and 68 O.S. 424 — 68 O.S. 429, makes it clear that the bill's principal objective is not the raising of revenue. Its principal object is the establishment of collection mechanisms — mechanisms for law fully collecting cigarette tax, already due under existing law, from a tribe's sales to non-tribal members. See, 68 O.S. 301 — 68 O.S. 324 and 68 O.S. 401 — 68 O.S.423. The establishment of the in lieu of payments is incidental to the act's principal object, as they were designed to see that no tax is collected on sales to tribal members. Because the principal object of Senate Bill 759 is not the raising of revenue, but is the establishment of a collection system, we conclude that Senate Bill 759 is not a "revenue raising" or "revenue bill" as those terms are used in Article V, Section 33
of the Oklahoma Constitution.
 II.
¶ 18 Your second question asks whether the provisions of Section 4 of Senate Bill 759, codified as 68 O.S. 349 (1992), violates the Indian Commerce Clause of the United States Constitution by imposing a tax upon the sale of cigarettes by a tribe to members of the tribe. Because the law is specifically designed to insure that no tax is imposed on the sale of cigarettes by a tribe to tribal members, we find that no imposition of such tax is present.
¶ 19 As noted above, Section 4 of Senate Bill 759, which establishes a collection system for the sale of cigarettes by tribally owned or leased stores, is designed to insure that revenues are not collected on sales of cigarettes to tribal members. To accomplish this, tribes are taxed at 75% of the usual tax, and may receive a refund if the tribe can document that more than 25% of its sales is to tribal members:
 A federally recognized Indian tribe or nation may receive a refund for a portion of the tax imposed pursuant to the provisions of this section if it can provide sufficient documentation that sales of cigarettes to its tribal members exceed twenty-five percent (25%) of its total sales of cigarettes. The amount of the refund shall be the amount of tax paid which is attributable to sales of cigarettes made to tribal members which is in excess of twenty-five percent (25%) of the tribe's or nation's total sales of cigarettes. Refunds shall be paid quarterly. The Tax Commission shall promulgate rules and regulations to administer the provisions of this subsection.
68 O.S. 349(B) (1992).
¶ 20 Establishment of a reduced in lieu of tax, and the refund provisions, are consistent with the Act's intent not to tax sales to tribal members:
 It is the intent of the Legislature to establish a system of state taxation of sales of cigarettes and tobacco products made by federally recognized Indian tribes or nations or their licensees, other than such tribes or nations which have entered into a compact with the State of Oklahoma pursuant to the provisions of subsection C of this section, under which the rate of payments in lieu of state taxes is less than the rate of state taxes on other sales of cigarettes and to-bacco products in order to allow such tribes or nations or their li censees to make sales of cigarettes and tobacco products to tribal members free of state taxation.
68 O.S. 346(B) (1992).
¶ 21 As demonstrated, both the intent and effect of the law is not to impose a tax on a tribe's sale of cigarettes or tobacco products to tribal members. Accordingly, the possible violation of the Indian Commerce Clause suggested by your question is not present.
 III.
¶ 22 Your third question asks whether the disclaimer provisions of the Oklahoma Enabling Act prohibit the State of Oklahoma from collecting cigarette and tobacco sales and excise taxes on the sale of such products by tribally owned or leased stores to non-tribal members. Sections 1 and 3 of Oklahoma's Enabling Act must be examined in addressing your question. Section 1 of Oklahoma's Enabling Act, 34 Stat. 267, is a general reservation of federal and tribal jurisdiction over "Indians, their lands, and property, except as extinguished by the tribes or the federal government." Indian Country, U.S.A. v. Oklahoma Tax Comm.,829 F.2d 967, 979 (10th Cir. 1987). The section authorizes the inhabitants of combined Oklahoma and Indian territory to adopt a constitution, requiring that nothing in the Constitution impair the Federal government's jurisdiction over Indians or their land, as follows:
 Provided, that nothing contained in the said constitution shall be construed to limit or impair the rights of persons or property pertaining to the Indians of said Territories (so long as such rights shall remain unextinguished) or to limit or affect the authority of the Government of the United States to make any law or regulation respecting such Indians, their lands, property or other rights by treaties, agreement, law or otherwise, which it would have been competent to make if this Act had never been passed.
June 16, 1906, c. 3335, 1, 34 Stat. 267.
¶ 23 In authorizing the people of the combined territories to adopt and present a constitution, the Enabling Act at Section 3 requires that the constitution meet specific requirements, among them requirement 3, which deals with disclaimers on right and title to Indian land:
 That the people inhabiting said proposed State do agree and declare that they forever disclaim all right and title in or to any unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian, tribe or nation; and that until the title to any such public land shall have been extinguished by the United States the same shall be and remain subject to the jurisdiction, disposal and control of the United States. That land belonging to citizens of the United States residing without the limits of said State shall never be taxed at a higher rate than the land belonging to residents thereof; that no taxes shall be imposed by the State on lands or property belonging to or which may hereafter be purchased by the United States or reserved for its use.
June 16, 1906, c. 3335, 3, 34 Stat. 269.
¶ 24 As the United States Court of Appeals for the Tenth Circuit held in Indian Country, U.S.A. v. Oklahoma TaxCommission, 829 F.2d 967, 978 (10th Cir. 1987), "upon Oklahoma's admission to statehood in 1907, federal authority ended with regard to non-Indians." Thus we see that Oklahoma's Enabling Act may not be read as a disclaimer of jurisdiction over non-Indians.
¶ 25 In Indian Country, U.S.A. v. Oklahoma Tax Commission,
the Court of Appeals for the Tenth Circuit held that the series of federal laws enacted prior to statehood, including Oklahoma's Enabling Act, "do not divest the federal government of authority over Creek tribal lands, do not abolish the Creek Nation's legislative and regulatory authority over such lands, and do not evince a clear intent by Congress to permit the State to assert jurisdiction." Id. at 981. In so concluding, the Court of Appeals held that this conclusion regarding federal and tribal jurisdiction did not preclude, under certain circumstances, the State from "validly asserting authority over the activities of non-members on a reservation." Id. Then, in holding that the State could not impose a tax upon Indian bingo operations, the Court took great pains to distinguish the situation presented by the bingo operations, from the imposition of a state tax on cigarettes and tobacco products that were imported onto reservations for resale. 829 F.2d at 982 and 984-986. As the Court of Appeals noted, the United States Supreme Court has specifically upheld the imposition of state taxes on the tribal sales of cigarettes and tobacco products to non-Indians. Id.
¶ 26 In Moe v. Confederated Salish and Kootenai Tribes,425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), the United States Supreme Court considered, among other things, the validity of various state taxes imposed upon the tribes' sale of cigarettes and tobacco products. The Court held that although the state lacked the power to collect cigarette sales tax on reservation sales by Indians to Indians, the state nevertheless could require Indian retailers on the reservations to "add the tax on cigarettes to the sales price and thereby aid the State's collection and enforcement thereof." 425 U.S. at 483.
¶ 27 In holding that the state could require the tribal sellers to collect the state tax validly imposed on non-Indians, the Supreme Court noted that the competitive advantage which the Indian sellers doing business on tribal land enjoy over all other cigarette retailers, within and without the reservation, depended on the extent to which the non-Indian purchaser was "willing to flout his legal obligation to pay the tax," and then held that unless the seller collected such tax, nonpayment of such tax would virtually be unchecked:
 Without the simple expedient of having the retailer collect the sales tax from non-Indian purchasers, it is clear that wholesale violations of the law by the latter class will go virtually unchecked.
425 U.S. at 482.
¶ 28 Some four years later in Washington v. ConfederatedTribes of Colville, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10
(1980), the Supreme Court once again had occasion to consider the validity of a State tax on the sale of cigarettes and tobacco products by Indian vendors, on the reservation, to non-Indians. The Court upheld the State's right to impose such tax.447 U.S. at 156-159. In Colville, the argument was made that a provision similar to Section 3 of Oklahoma's Enabling Act, contained in Washington's Enabling Act, prohibited the imposition of such tax.447 U.S. at 155. The Court rejected the argument finding that the Enabling Act reflected "an intent that the State not tax reservation lands or income derived therefrom, but the present taxes are assessed against nonmembers of the Tribes and concern transactions and personalty with no substantial connection to reservation lands." 447 U.S. at 156.
¶ 29 We see nothing in the language of Oklahoma's Enabling Act which would prohibit the imposition of similar taxes by the State of Oklahoma. Accordingly, we conclude that the provisions of the Oklahoma Enabling Act do not prohibit the imposition of state sales and excise tax on the sale of cigarette and cigarette products by Indian vendors to non-Indians.
 IV.
¶ 30 Your fourth question asks whether the collection of cigarette tax on the sale to non-tribal members, under the statutory scheme provided for in Senate Bill 759, places an unreasonable burden on commerce with Indian tribes. Although whether a particular activity imposes an undue burden is usually a question of fact, the United States Supreme Court has already considered the effect upon tribal governments' interests of much of what is provided for in Senate Bill 759 finding that no undue burden exists. In Moe v. Confederated Salish and KootenaiTribes, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), discussed above, the Supreme Court concluded that the state requirement that tribal sellers collect state tax imposed only a minimum burden:
 The State's requirement that the Indian tribal seller collect a tax valid imposed on non-Indians is a minimal burden designed to avoid the likelihood that in its absence non-Indians purchasing from the tribal seller will avoid payment of a concededly lawful tax. Since this burden is not, strictly speaking, a tax at all, it is not governed by the language of Mescalero . . . dealing with the "special area of state taxation." We see nothing in this burden which frustrates tribal self-government, or runs afoul of any congressional enactment dealing with the affairs of reservation Indians. (Citations omitted.)
425 U.S. at 483 (emphasis added).
¶ 31 Concluding, the Court in Moe upheld tribal tax collecting:
 We therefore agree with the District Court that to the extent that the "smoke shops" sell to those upon whom the State has validly im posed a sales or excise tax with respect to the article sold, the State may require the Indian proprietor simply to add the tax to the sales price and thereby aid the State's collection and enforcement thereof.
Id. (emphasis added).
¶ 32 In more specific detail, the United States Supreme Court considered other burdens imposed by the State in Washington v.Confederated Tribes of Colville, 447 U.S. 134, 100 S.Ct. 2069,65 L.Ed.2d 10 (1980). In Colville, the tribe argued that if the state were permitted to impose its tax, "the Tribes will no longer enjoy any competitive advantage vis-a-vis businesses in surrounding areas." 447 U.S. at 154. In rejecting this argument, the Court first noted that the income generated from smoke shop sales was generated not from tribal activities on the reservation in which the tribe has a significant interest, but rather came from outside the reservation. The Court also held that what the smoke shops were offering was an exemption from taxation:
It is painfully apparent that the value marketed by the smokeshops to persons coming from outside is not generated on the reservations by activities in which the Tribes have a significant interest. Cites omitted. What the smokeshops offer these customers, and what is not available elsewhere, is solely an exemption from state taxation.
447 U.S. at 155.
¶ 33 The Court then concluded that no principle of federal law, whether stated in terms of preemption or tribal self-government, or otherwise, authorizes the tribe to market tax exemptions:
 We do not believe that the principles of federal Indian law, whether stated in terms of preemption, tribal self-government, or otherwise, authorize Indian tribes thus to market an exemption from state taxation to persons who would normally do their business elsewhere.
447 U.S. at 155.
¶ 34 Turning to more specific provisions of the tax imposed inMoe, the Court found that they did not present an undue burden, and upheld the collection of tax by the tribe:
 We recognized in Moe that if a State's tax is valid, the State may impose at least minimal burdens on Indian businesses to aid in collecting and enforcing that tax. The simple collection burden imposed by Washington's cigarette tax on tribal smokeshops is legally indistinguishable from the collection burden upheld in Moe.
447 U.S. at 159.
¶ 35 In line with this general conclusion, the Court also held the State may validly require the affixing of state tax stamps by the tribe:
 [W]e therefore hold that the State may validly require the tribal smokeshops to affix tax stamps purchased from the State to individual packages of cigarettes prior to the time of sale to nonmembers of the Tribe.
Id.
¶ 36 The Court also upheld record keeping requirements, a scheme which required smokeshop operators to "keep detailed records of both taxable and nontaxable transactions" and including "the number and dollar volume of taxable sales to non-members of the tribe." Id. The record keeping requirements upheld also required the operator to "record and retain for state inspection the name of all Indian purchasers, their tribal affiliations, the Indian reservations within which sales are made and the dollar amount and date of sales." Id. In addition, unless the Indian purchaser was personally known to the operator, the purchaser was required to present a tribal identification card. Id. The United States Supreme Court upheld all these record keeping requirements "in toto." 447 U.S. at 160.
¶ 37 In upholding the State of Washington's tax collection scheme, the Supreme Court held that the federal statutes, even given the broadest reading, "could not be said to preempt Washington's power to impose this tax on Indians not members of the tribe." Id. Thus we see that the tax permitted to be imposed by the state was on all non-tribal members, not just all non-Indians.
¶ 38 The final matter considered by the court in Colville was the State's contention that it had the power to seize unstamped cigarettes as contraband, if the tribes did not cooperate in collecting the State's tax. The Court found that Washington's interest in enforcing this valid tax was "sufficient to justify these seizures." 447 U.S. at 161. So holding, the Court found that it was significant that the seizures take place outside the reservation locations where State power over Indian affairs is considerably more expansive than it is within reservations' boundaries, and that by seizing cigarettes in route to the reservation, the State enforced its policy against wholesale evasion of its own valid taxes, "without unnecessarily intruding on core tribal interests." 447 U.S. at 162.
¶ 39 In light of the United States Supreme Court's rulings in both Colville and Moe, we conclude that similar tax collection procedures established by Senate Bill 759 cannot be viewed as imposing unnecessarily intrusive burdens on tribal self-government interests.
 V.
¶ 40 In your fifth and final question, you ask what mechanisms, in light of the tribes' sovereign immunities, are available for the collection of cigarette taxes under Senate Bill 759. You further ask whether these mechanisms are feasible and whether they are likely to result in extended litigation.
¶ 41 We know, from the United States Supreme Court ruling inOklahoma Tax Commission v. Citizen Band Potawatomie Indian Tribeof Oklahoma, 498 U.S. ___, 111 S.Ct.905,112 L.Ed.2d 1112 (1991), that one mechanism not available to the State is a suit against the tribe, as the tribe's sovereign immunity protects it from such suit. We also know from that decision, however, that several alterative remedies are available: (1) suits against individuals or agents or officers of the tribe, where applicable; (2) seizure, assuming it is done lawfully, of unstamped cigarettes off the reservation; and, (3) entering into compacts with tribes for the collection under a mutually satisfactory collection regimen. 111 S.Ct. at 912. Whether these or any other remedy are available in any particular circumstance is a question of fact, not one of law, which cannot be addressed in an Attorney General Opinion.
¶ 42 Additionally, the feasibility of any particular collection mechanism and the nature, complexity and length of any ensuing litigation are questions of fact which cannot be determined in an Attorney General Opinion.
¶ 43 It is, therefore, the official Opinion of the AttorneyGeneral that:
 1. Senate Bill 759, 1992 Okla. Sess. Law, c., 339, establishes procedures for collecting cigarette and tobacco product sales and excise taxes on the sale of those products by Indian tribes, by amending or enacting various provisions of Title 68 of Oklahoma Statutes, including 346-352 and 424-429. Senate Bill 759 is not a "revenue raising" bill or "revenue bill" within the meaning of Article V, Section 33 of the Oklahoma Constitution, because its principal object is not the raising of revenue; rather, its principal object is the establishment of tax collection procedures.
 2. The provisions of 68 O.S. 349 (1992), do not impose either an excise or sales tax upon a tribe's sale of cigarettes or tobacco products to members of the tribe. That section, consistent with the State Legislature's stated intention, was particularly designed to insure that sales to tribal members would not be taxed.
 3. The provisions of Sections 1 and 3 of Oklahoma's Enabling Act, 34 Stat. 267 and 269, do not prohibit the State from imposing excise and sales tax on an Indian tribe's sale of cigarettes or tobacco products to non-tribal members, under 68 O.S. 346-352; 301-324; 401-423; 424-429; and 1355.
 4. A determination of whether specific actions by the State may constitute unnecessarily intrusive burdens on an Indian tribe's self-government interest is usually a question of fact. The United States Supreme Court, however, has upheld the validity of burdens imposed by a State's collection of cigarette excise and sales tax on the sale of cigarettes by tribes to non-tribal members, under restrictions and conditions like and similar to those imposed by Senate Bill 759, 1992 Okla. Sess. Laws, c., 339, which amended or enacted 68 O.S. 301 (1992); 68 O.S. 309; 68 O.S. 321; 68 O.S. 346 — 68 O.S. 352; 68 O.S. 401; 68 O.S. 401.3; 68 O.S. 419; 68 O.S. 424 — 68 O.S. 429; and 68 O.S. 1355.
 5. Because of an Indian tribe's sovereign immunity, a direct suit against a tribe to impose the collection of state cigarette and tobacco product excise and sales tax on the tribe's sale of cigarettes and tobacco products to non-tribal members, is not available. However, the United States Supreme Court in Oklahoma Tax Commission v. Citizen Band Potawatomie Tribe of Oklahoma, 498 U.S., 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991), has upheld other collection mechanisms such as agreements with tribes; seizure of contraband cigarettes off the reservation; and suits against individuals who fail or refuse to carry out their collection responsibilities. Whether any of these, or other mechanisms or remedies are available in any particular circumstance is, of course, a question of fact which cannot be addressed in an Attorney General Opinion. Additionally, the feasibility of any particular collection mechanism and the nature, complexity and length of any ensuing litigation are questions of fact which cannot be determined in an Attorney General Opinion.
SUSAN BRIMER LOVING ATTORNEY GENERAL OF OKLAHOMA
NEAL LEADER SENIOR ASSISTANT ATTORNEY GENERAL