In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3419

ONEIDA TRIBE OF INDIANS OF WISCONSIN,

*Plaintiff-Appellee,*

*v.*

VILLAGE OF HOBART, WISCONSIN,

*Defendant-Third-Party Plaintiff-Appellant,*

*v.*

UNITED STATES OF AMERICA, *et al.,*

*Third-Party Defendants-Appellees.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 10-C-137 — **William C. Griesbach**, *Chief Judge.*

ARGUED SEPTEMBER 18, 2013 — DECIDED OCTOBER 18, 2013

Before BAUER, POSNER, and TINDER, *Circuit Judges.*

POSNER, *Circuit Judge.* In 2007 the Village of Hobart, Wisconsin passed an ordinance assessing stormwater management fees on all parcels of land in the village, including those owned by the Oneida Nation of Wisconsin, an Indian

tribe. The purpose of the assessment was to finance the construction and operation of a stormwater management system. The tribe sought a declaratory judgment that the assessment could not lawfully be imposed on it. Hobart contended that if the tribe was right on that score (Hobart thought it was wrong), the United States must pay the fees; and so it filed a third-party complaint against the United States. The district judge rendered summary judgment for the tribe and granted the motion of the United States to dismiss the third-party claim. The Village appeals both rulings.

Hobart is a small town in rural Wisconsin, near Green Bay. Its population is less than 7000, of whom about 17 percent are Indians of the Oneida tribe. The Indians' homes are not confined to one neighborhood. They are scattered throughout the village and as a result the Indian and non-Indian properties form an irregular checkerboard pattern. The village itself is an enclave in the tribe's reservation.

The significance of the checkerboard pattern is that title to 148 parcels of land in Hobart—comprising about 1400 acres, amounting to 6.6 percent of the village's total land—is held by the United States in trust for the Oneida tribe. Congress has authorized the federal government to buy land and hold it in trust for Indian tribes. 25 U.S.C. § 465; *Carcieri v. Salazar*, 555 U.S. 379, 381–82 (2009). Normally the land is, as in this case, within the boundaries of an Indian reservation. The non-Indian parcels in Hobart are technically part of the surrounding Oneida reservation as well, but they are subject to state rather than tribal sovereignty, and thus are subject to state taxation and regulation. Tribal trust land, in contrast, may not be taxed by either state or local governments. 25 U.S.C. § 465.

The federal government holds little more than "bare" legal title to the trust land; with immaterial exceptions the tribe governs trust lands just as it does lands to which it holds title. See, e.g., 25 U.S.C. § 415(a); *Montana v. United States*, 450 U.S. 544, 557 (1981). And so trust lands are part of "Indian country," 18 U.S.C. § 1151; *Oklahoma Tax Commission v. Sac & Fox Nation*, 508 U.S. 114, 123 (1993)—in fact the largest part. *Cohen's Handbook of Federal Indian Law* § 15.03, p. 997 and n. 1 (Nell Jessup Newton ed., 2012).

One may wonder why the government holds legal title to any Indian land—why it doesn't just buy land and give it to an Indian tribe or, simpler still, give the tribe the money to buy the land. The reason is to increase the likelihood that Indian territory will remain Indian territory; for unlike land held in fee simple by an Indian tribe, trust land is inalienable without federal authorization. See 25 U.S.C. §§ 81, 177; 25 C.F.R. § 152.22. So one may wonder how it is that non-Indians own land in Hobart even though the village is entirely within the boundaries of the Oneida reservation. The answer is that over time and through a variety of statutory provisions a great deal of Indian land has been acquired by non-Indians. See *Cohen's Handbook, supra*, § 1.04, pp. 73–74; §16.03[2][b], pp. 1073–74.

Federal trusteeship underscores the fact that land acquired by the federal government in trust for Indians is, like original tribal land, for the most part not subject to state jurisdiction. Although the Supreme Court no longer believes that "the treaties and laws of the United States contemplate the Indian territory as completely separated from that of the states," *Worcester v. Georgia*, 31 U.S. 515, 557 (1832) (Marshall, C.J.); see *Nevada v. Hicks*, 533 U.S. 353, 361 (2001), it remains

true that "Indian treaties, executive orders, and statutes preempt state laws that would otherwise apply by virtue of the states' residual jurisdiction over persons and property within their borders. Federal preemption of state law in the field of Indian affairs has persisted as a major doctrine in the Supreme Court's modern Indian law jurisprudence." *Cohen's Handbook*, *supra*, § 2.01[2], p. 112. So when the federal government acquires land in trust for Indians, the consequence is to "reestablish [the Indians'] sovereign authority" over that land. *City of Sherrill v. Oneida Indian Nation*, 544 U.S. 197, 221 (2005).

It is awkward for parcels of land subject to one sovereign to be scattered throughout a territory subject to another. But actually it's a familiar feature of American government. Federal facilities of all sorts, ranging from post offices to military bases, are scattered throughout the United States, and are subject to only as much regulation by states and local governments as the federal government permits. A similar scatter is common in Indian country, primarily as a result of allotment acts (later repealed) in the late 1800s and early 1900s, notably the Dawes (General Allotment) Act of 1887, 25 U.S.C. § 331—acts allotting reservation land to individual families to liberate them from tribal ownership that Congress in that era considered socialistic, to encourage their assimilation into mainstream American life, and not incidentally to facilitate the transfer of Indian land to non-Indians. See *Cohen's Handbook*, *supra*, § 1.04, pp. 72–75.

The question in this case is whether the federal government has authorized the Village of Hobart to assess fees on Indian lands in the village (or taxes—whether the assessments are fees or taxes is a separate issue, discussed at the

end of this opinion) to pay for its stormwater management program.

Although the authority of a state or local government over Indian territory is limited, it is not negligible, especially when Indians and non-Indians live in close proximity. No one doubts that Village of Hobart firefighters can enter Indian land in the village in the same circumstances in which they can enter land owned by non-Indians. But the only premise that the Village advances for a right to impose on the Indian lands charges for pollution control is section 313(a) of the Clean Water Act, 33 U.S.C. § 1323(a), which provides, so far as relates to this case, that

> each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants, and each officer, agent, or employee thereof in the performance of his official duties, shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity including the payment of reasonable service charges.

Hobart argues that this provision subjects tribal trust lands to local authority over stormwater runoff—a cause of water pollution acknowledged by Congress in enacting stormwater amendments to the Clean Water Act. See 33 U.S.C. § 1342(p). Unmanaged stormwater runoff absorbs pollutants in its path and often deposits them in nearby bodies of water that are classified as waters of the United States

and therefore subject to federal regulation. See National Pollutant Discharge Elimination System—Regulations for Revision of the Water Pollution Control Program Addressing Storm Water Discharges, 64 Fed. Reg. 68,722, 68,724 (Dec. 8, 1999). Hobart's stormwater management program (adopted though not yet fully implemented) is intended to reduce, so far as the Clean Water Act requires, pollution caused by stormwater runoff.

Although section 313(a) does waive federal immunity from local regulation of stormwater runoff, it does not address the underlying authority of local governments to regulate that runoff on Indian lands. The federal Environmental Protection Agency has the whip hand. Congress has authorized it to establish and enforce nationwide standards for regulating pollution, including stormwater pollution, of waters of the United States. 33 U.S.C. §§ 1251(a), (d); 1361(a). The agency's "National Pollutant Discharge Elimination System," cited above, requires that the discharge of stormwater into waters of the United States comply with permits that "shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the Administrator or the State determines appropriate for the control of such pollutants." 33 U.S.C. § 1342(p)(3)(B)(iii); see also 40 C.F.R. § 122.34(a).

But notice the phrase "or the State determines." Congress has authorized the EPA to delegate to states the authority to issue stormwater management permits within their boundaries, 33 U.S.C. § 1342(b), and Wisconsin is one of the states to which the authority has been delegated. But the uniform

understanding has been that states and their subdivisions are not authorized to regulate stormwater or other pollution on *Indian* lands, including Indian trust lands. *Cohen's Handbook, supra*, § 10.02[1], at 789–90. Those lands are not exempt from the Clean Water Act. But it is the Indian governments of those lands, in this case the government of the Oneida tribe, rather than states, that can be delegated regulatory authority under the Act. See 33 U.S.C. § 1377(e)(2); 40 C.F.R. § 122.31(b). So far as federal regulation of water pollution is concerned, tribes equal states—they are not subservient to them.

The eleven federally recognized tribes in Wisconsin occupy about a thousand square miles. Wisconsin Department of Administration, Division of Intergovernmental Relations, *Tribes of Wisconsin* 3, Appendices A through K (July 2013), ftp://doaftp1380.wi.gov/Doadocs/2011_Tribes_of_WI_v_7-2013.pdf (visited Oct. 15, 2013). They are self-governing entities, and there is no indication that in section 313(a) of the Clean Water Act (a section that contains no mention of Indians) Congress decided to place the regulation of pollution in their territory under state control. Other federal properties in a state—post offices, for example—are subject to delegated state administration of the Clean Water Act, but not Indian reservations, which for purposes of the Act are equated to states. 33 U.S.C. § 1377(e); 40 C.F.R. § 131.3(j).

Wisconsin itself, in applying for permitting authority under the Act in 1979, disclaimed authority to regulate stormwater runoff on Indian lands. And Hobart acknowledged this by applying for a runoff permit not from the state but from the EPA. It couldn't obtain a permit from the state because it wanted the permit to cover the 148 Indian parcels,

and the state had disclaimed regulatory authority over those parcels. For the same reason, the Oneida tribe couldn't obtain a permit from the State of Wisconsin either, and so it too applied to the EPA for a permit. (The EPA has granted tentative, but not yet final, permits to both Hobart and the tribe.)

It does seem odd (to pick up on an earlier point) that there should be two separate stormwater management programs in tiny Hobart, administered by different sovereigns. Indeed, given the checkerboard pattern of Indian and non-Indian land ownership in the village, it's difficult to see how there *can* be separate programs. We are told that both the tribe and the Village have at least some stormwater runoff facilities in the village, serving their respective constituencies. It's difficult to visualize that; the Village presumably owns all the streets, and storm sewers run under streets. But storm sewers are not the only devices for regulating stormwater runoff; alternatives include retention ponds, and apparently there is one or more of them on Indian land in Hobart.

Nevertheless we can imagine an argument, built on our earlier example of the Village's authority to deploy its firefighters on Indian parcels, for an exception of necessity—a common law graft onto the Clean Water Act—to the Oneida tribe's exclusive authority over Indian land. But the Village doesn't argue for such an exception; it doesn't deny the feasibility of cooperative arrangements between it and the tribe, which has signed cooperative service agreements with other government bodies in the area.

So Hobart loses its case against the tribe. And there is another reason it must lose. Because federal law forbids states and local authorities to tax Indian lands, the tribe can't be

forced to pay the assessment decreed by the challenged or-dinance if the assessment is a tax.

In *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 651 F.3d 722, 728 (7th Cir. 2011) (en banc), we rejected the cumbersome multifactor tests that some courts had used to try to distinguish between taxes and fees. We said that

> the only material distinction [between taxes and fees] is be-tween exactions designed to generate revenue—taxes, whatever the state calls them … —and exactions designed either to punish (fines, in a broad sense) rather than to generate revenue (the hope being that the punishment will deter, though deterrence is never perfect and therefore fines generate some state revenues), or to compensate for a service that the state provides to the persons or firms on whom or on which the exaction falls (or, what is similar, to compensate the state for costs imposed on it by those per-sons or firms, other than costs of providing a service to them): in other words, a fee.

Judged by this standard—which Hobart accepts—the stormwater runoff assessment is a tax rather than a fee. It is designed to generate revenue to pay for a governmental pro-ject. It is not a fee for a service provided to a particular land-owner. The landowners in the village are unlikely to be harmed by stormwater runoff, and therefore helped by the Village's stormwater management program. Pollution caused by the runoff would affect the streams and other bodies of water, none of them in the village so far as ap-pears, into which the stormwater carries pollutants. Neither is the fee a penalty for the landowner's imposition of a cost on the Village; the causal relation between a particular land-owner's activities and the amount of stormwater runoff pol-lution resulting from rainstorms in Hobart is obscure, and

the assessment scheme does not assign causal responsibility for particular pollution to particular landowners. Furthermore, unpaid stormwater runoff assessments become liens on the property subject to the assessments, and are enforceable in the same manner as real property taxes—though the imposition, let alone the foreclosure, of liens on land to which the federal government holds legal title is out of the question.

In its third-party complaint against the United States, the Village argues that if the Oneida tribe isn't liable to pay the assessment, the federal government is, by virtue of the waiver in section 313(a) of the Clean Air Act of its immunity from "reasonable service charges." But a tax is not a reasonable service charge; section 313(a) makes no reference to tribal lands; and the federal government is merely the holder of legal title to the 148 parcels in question, not the occupant. The government's status as trustee rather than merely donor of tribal lands is designed to preserve tribal sovereignty, not to make the federal government pay tribal debts. Anyway there are no tribal debts to Hobart.

AFFIRMED.