This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports.  Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions.  Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**No. A-1-CA-40476**

**NEW MEXICO ENVIRONMENT DEPARTMENT RESOURCE PROTECTION DIVISION,**

Complainant-Appellee,

v.

**HRV HOTEL PARTNERS, LLC,**

Respondent-Appellant,

and

**BL SANTA FE, LLC,**

Respondent.

**APPEAL FROM THE NEW MEXICO ENVIRONMENT DEPARTMENT**
**Gregory A. Chakalian, Hearing Officer**

Christopher N. Atencio, Deputy General Counsel
Albuquerque, NM
Kathryn S. Becker, Assistant General Counsel
Santa Fe, NM

for Appellee

Domenici Law Firm
Pete Domenici
Lorraine Hollingsworth
Albuquerque, NM

for Appellant

**MEMORANDUM OPINION**

**WRAY, Judge.**

**{1}**     HRV Hotel Partners, LLC (HRV) appeals the decision of the New Mexico Environment Department (NMED), which found four violations of the New Mexico Solid Waste Act (SWA), NMSA 1978, §§ 74-9-1 to -43 (1990, as amended 2011) and certain Solid Waste Regulations (SWR), *see* 20.9.2 to 20.9.10 NMAC, in relation to the disposal of solid waste on the Pueblo of Pojoaque (the Pueblo). HRV contends that several findings made by the administrative hearing officer and adopted by the NMED Secretary were not supported by the evidence; the decision oversteps the jurisdiction of NMED; the civil penalty was assessed without notice or basis; and liability was improperly apportioned. We affirm.

## BACKGROUND

**{2}**     NMED entered a compliance order that identified four violations of the SWR by BL Santa Fe, LLC (BL Santa Fe) and HRV together as "Respondents," assessed civil penalties, and ordered Respondents to make arrangements for remediation. Specifically, the compliance order found that Respondents did not register as "a hauler of special waste," *see* 20.9.3.31(A) NMAC, assure "that a special waste manifest . . . accompanied each truckload" of waste, *see* 20.9.8.10(F) NMAC, sufficiently document the characteristics of the waste, *see* 20.9.2.10(B) NMAC, or properly dispose of the waste, *see* § 74-9-31(A)(1)(a); 20.9.8.8 NMAC; 20.9.2.10(A)(1), (3) NMAC. BL Santa Fe and HRV requested a hearing on the compliance order and submitted an answer, which initiated the appeals process. *See* 20.1.5.200(A)(1)-(2) NMAC. Before the hearing, the lawyer jointly representing BL Santa Fe and HRV withdrew, separate lawyers thereafter entered appearances for each entity, and BL Santa Fe settled with NMED. After the hearing, the hearing officer entered a report and recommended that the NMED Secretary uphold the compliance order against HRV. The NMED Secretary adopted the hearing officer's recommendation and upheld the compliance order. HRV appeals.

## DISCUSSION

**{3}**     In this appeal, we "set aside the administrative action only if it is found to be: (1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with law." *See* § 74-9-30(B); *Colonias Dev. Council v. Rhino Env't Servs.*, 2005-NMSC-024, ¶ 13, 138 N.M. 133, 117 P.3d 939. We begin with the evidence supporting the decision and then turn to HRV's challenges to NMED's authority to order remediation and the penalty assessment and apportionment.

## I.     The Evidence Supporting NMED's Decision

**{4}**     NMED's ultimate conclusion was that together, Respondents BL Santa Fe and HRV committed four violations of the SWR and SWA that were subject to penalties. On appeal, HRV does not contest that the four individual violations occurred. Instead, HRV maintains that the evidence did not support a conclusion either that HRV arranged for

removal and disposal of the sludge or that HRV directly transported the sludge. Specifically, HRV first argues that substantial evidence did not support the hearing officer's findings that BL Santa Fe and HRV were the same entity. Second, HRV argues that the evidence did not show that HRV directly participated in activities prohibited by the SWA or the SWR. As a result, HRV contends that it was not subject to the SWA or its penalties. We review HRV's challenge to the evidence supporting the findings and "apply 'whole record' review, meaning that we examine all of the evidence in the record, not just the evidence that supports the decision." *Pickett Ranch, LLC v. Curry*, 2006-NMCA-082, ¶ 5, 140 N.M. 49, 139 P.3d 209.

**{5}** The specific findings and conclusions that HRV challenges fall into two categories. First, findings 20, 21, and 23 (the bad act findings) find that HRV: constructed a replacement wastewater retention pond at Bishops Lodge, removed sludge from existing wastewater retention ponds, disposed of that sludge on land owned by the Pueblo, and misinformed the truckers who were hired to haul the sludge about its true nature. The evidence that the hearing officer cited to support the bad act findings does not tie HRV or its employees to these actions. The tie between the bad act findings and HRV is found in the remaining challenged findings and conclusions, findings 5, 5a-5h, 25, and 48, as well as conclusions of law 56, 58, 59, and 63 (the operational findings). The operational findings establish that HRV and its employees were involved in the operation of Bishops Lodge, including the wastewater retention pond. Therefore, it is on these findings that we focus our attention.

**{6}** The administrative record—including HRV's admissions in pleadings and the evidence presented at the hearing—supported the following operational findings. HRV admitted findings 5a and 25 in its answer—that it owned and operated Bishops Lodge and that it was a "hauler" which transported three loads of solid waste to Pueblo lands. HRV representatives attended inspections and communicated with NMED investigators about the closure of "wetland cells" on Bishops Lodge in February 2018, *before* the violations that were related to the closure of the "wetland cells" occurred in March, as referenced in finding 5g. Individuals using HRV email addresses were involved in a groundwater discharge permit that was part of a related investigation, as referenced in finding 5d, and HRV submitted the application for that permit, as referenced in finding 5e. HRV was involved in retaining or hiring a wastewater treatment plant operator and addressing the issues the plant operator raised with "the lodge," as referenced in finding 5f. The owner of HRV explained that "as the developer of the property," HRV "interface[d] with a lot of . . . different aspects of the project even though [HRV wasn't] in charge of them." The owner confirmed that as the hearing officer found in finding 5h, "HRV's name was on the signs at the property as the primary contact; it was the public face of Bishops Lodge." Ultimately, in finding 48, the hearing officer found that "NMED assessed the civil penalty against both Bishops Lodge, LLC and HRV based on its belief that they were one and the same entity," and the NMED investigator's testimony supported this finding about why NMED assessed the penalty against both entities.

**{7}** HRV nevertheless argues that each of these findings were contradicted by other testimony, did not demonstrate HRV's involvement in the regulatory violations at issue,

or were supported "only" by the original answer. Based on events preceding the hearing, however,[1] the hearing officer treated HRV's admissions in the joint answer filed with BL Santa Fe as prima facie evidence as to those facts and gave HRV the opportunity to rebut those facts. On appeal, HRV does not challenge whether the hearing officer appropriately viewed the original answer as prima facie evidence to be rebutted. *See* 20.1.5.400(C)(1) NMAC (requiring NMED to establish a prima facie case "by a preponderance of the evidence the facts relied upon to show the violation occurred and the proposed civil penalty is appropriate," and if NMED is successful, mandating that the respondent offer adverse evidence or defenses to the allegations). As such, we consider the evidence as the hearing officer did: whether HRV rebutted the admissions in the original answer that HRV owned and operated Bishops Lodge and HRV was a hauler that transported three solid waste loads to the Pueblo.

{8}     HRV contends that NMED did not rebut "the testimony of Michael Sheppard and Margie Holland that HRV did not at any time operate the Bishops Lodge facility, including the wastewater treatment facility, and the HRV's only role was the redevelopment of the property." HRV maintains that the evidence that HRV owns no trucks rebuts the admission that it was a hauler. HRV did not offer evidence or testimony to explain its change in position from the time of the original answer to the supplemental answer or offer any explanation for what "redevelopment" might mean or how it differs from "operating" Bishops Lodge. HRV essentially asks this Court to reweigh the evidence and determine that the evidence it presented rebutted the prima facie evidence established by its own admissions. This we will not do. *See Regents of Univ. of Calif. v. N.M. Water Quality Control Comm'n*, 2004-NMCA-073, ¶ 29, 136 N.M. 45, 94 P.3d 788 (explaining that this Court does "not reweigh the evidence"). Instead, we conclude that the hearing officer reasonably determined that HRV's contradictory evidence did not disprove its earlier admissions that HRV owned and operated Bishops Lodge. *See* 20.1.5.400(C)(3) ("Each matter of controversy shall be determined by the [h]earing [o]fficer upon a preponderance of the evidence.").

{9}     HRV argues that even as an operator of Bishops Lodge, the SWA does not impose liability for "the general operation of a property on which solid waste is located." HRV points to Section 74-9-34 and argues that for a party to be liable under the SWA, the party must be either "any generator," *see* § 74-9-34(B)(7), or "any person who by agreement or otherwise arranged for disposal or treatment or transportation for disposal or treatment of solid waste owned or possessed by that person and disposed of in the solid waste facility." Section 74-9-34(B)(5). As we have set forth, however, the evidence demonstrated HRV's participation in the arrangement "for disposal or treatment or transportation for disposal or treatment of solid waste" from Bishops Lodge. *See id.* We

---

[1]In the original answer, HRV, together with BL Santa Fe, admitted that they owned and operated Bishops Lodge and "are 'haulers'" pursuant to the SWR. On March 2, 2022, two days before the hearing, HRV filed a "Supplemental Answer" and denied, in relevant part, paragraphs four and six of the compliance order "as applied to HRV" and asserted that "HRV denies the compliance schedule as applied to HRV because HRV is not an owner, operator, hauler, generator, storer, processor or disposes of solid or special waste."

therefore conclude that substantial evidence supported the hearing officer's findings and conclusions.

## II.    The Remediation Provision

**{10}**    HRV also challenges the remediation provision of the compliance order. The compliance order required HRV, in part, to "arrange with the Pueblo of Pojoaque for removal and remediation of the improperly disposed sludge and arrange for proper disposal pursuant to all applicable state, federal, and tribal laws" (the remediation requirement). The compliance order cited 20.9.8.8 NMAC (the regulation) and Pueblo of Pojoaque Tribal Council Resolution 2019-146 (the resolution). The regulation states that "[t]he generator of a special waste shall assure that the special waste is disposed of in a solid waste facility permitted to accept the special waste or treated at a permitted facility, prior to disposal, to render it a non-special waste." 20.9.8.8 NMAC. The resolution states that it is "AUTHORIZING THE OWNERS OF BISHOPS LODGE TO ARRANGE WITH THE PUEBLO FOR REMEDIATION OF THE ILLEGAL DUMP SITE NEAR THE PUEBLO OF POJOAQUE WASTEWATER FACILITY." The resolution authorizes "the owners of Bishops Lodge to arrange with the Pueblo for removal and remediation of the improperly disposed sludge at the Pueblo's direction, and arrange for proper disposal pursuant to all applicable state, federal, and tribal laws."

**{11}**    HRV argues that (1) the remediation requirement improperly forces HRV to subject itself to the jurisdiction of the Pueblo and compels the Pueblo to authorize HRV to act on Pueblo land; and (2) NMED was without authority to order action that could cause either result. Based on HRV's arguments and the authority presented, we conclude that HRV has not met its burden on appeal to show that NMED's remediation requirement was arbitrary and capricious, unsupported by the evidence, or "an abuse of the agency's discretion by being outside the scope of the agency's authority, clear error, or violative of due process." *See Regents of Univ. of N.M. v. N.M. Fed'n of Tchrs.*, 1998-NMSC-020, ¶ 17, 125 N.M. 401, 962 P.2d 1236 (internal quotation marks and citation omitted).

**{12}**    HRV first argues that administrative bodies are creatures of statute and neither the SWA nor the SWR "delegate any authority allowing NMED to order a party to enter tribal lands." NMED, however, did not order HRV to enter tribal lands. NMED ordered HRV to arrange with the Pueblo for remediation. To the extent that HRV enters tribal lands for the purposes of remediation, that entry would be by the Pueblo's invitation. HRV contends that no "practical distinction" exists between ordering HRV to enter tribal lands or to arrange for remediation, because "both directives would obligate HRV to enter and act on tribal lands." We disagree. As NMED asserts, the compliance order allows HRV "to coordinate a wide-range of possible solutions on its own and in cooperation with the Pueblo of Pojoaque without ever needing to enter into the Pueblo's sovereign territory." NMED has statutory authority to order a party to "provide removal or remedial action." Section 74-9-34(D); *see* § 74-9-36(D) (permitting the director to order "corrective action"). To the extent express statutory authority is required for NMED to order a nontribal member to engage in remediation on tribal lands—a question we do

not decide—NMED did not exceed its authority to order corrective action, because it did not order HRV to enter the Pueblo, but rather to arrange, or "provide," remedial action as authorized by the SWA. *See* § 74-9-34(D).

**{13}** Similarly, we cannot agree with HRV that the remediation requirement and resolution together caused the Pueblo to improperly delegate its jurisdiction to NMED or that NMED exercised jurisdiction over tribal lands such that the Pueblo was required to waive sovereign immunity. NMED did not require action to be taken on tribal lands, and HRV has not established that the Pueblo has ceded any authority to NMED to take any action—particularly as the resolution ensures that any remediation will be at the Pueblo's direction and in compliance with federal, state, and tribal law, without any waiver of sovereign immunity. HRV contends that state-ordered remediation cannot be achieved without the Pueblo waiving sovereign immunity, but the doctrine of sovereign immunity provides "the plenary right to be free from having to answer a suit." *See Hamaatsa, Inc. v. Pueblo of San Felipe*, 2017-NMSC-007, ¶ 26, 388 P.3d 977. We presume by its arguments that HRV intended to invoke the doctrine of tribal sovereign authority, which "concerns the extent to which a tribe may exercise jurisdictional authority over lands the tribe owns to the exclusion of state jurisdiction." *Id.* Specifically, HRV maintains that the Pueblo has an inherent right to self-governance and that only Congress may expressly "authorize a [s]tate to regulate property on tribal land," which HRV contends Congress has not done in this instance.

**{14}** For support, HRV cites a series of cases that involve different types of parties trying to achieve different goals than in the present case. *See Oneida Tribe of Indians of Wis. v. Vill. of Hobart*, 732 F.3d 837, 838, 842 (7th Cir. 2013) (resolving a village's appeal of the district court's determination that the Clean Water Act did not authorize the village to impose an assessment for stormwater management fees on parcels of land owned by the tribe); *Indian Country U.S.A., Inc. v. Okla. ex rel. Okla. Tax Comm'n*, 829 F.2d 967, 970, 976, 981, 983 (10th Cir. 1987) (determining that a tribe was immune from state taxation because neither federal or state law expressly authorized a state to tax gaming activities on treaty lands held by the tribe nor did the circumstances otherwise justify state jurisdiction); *Wash. Dep't of Ecology v. EPA*, 752 F.2d 1465, 1466 (9th Cir. 1985) (affirming a federal agency's determination that a state was not authorized by federal law to apply state hazardous waste regulations to "the activities of all persons, Indians and non[]Indians, on 'Indian lands'"). We are unpersuaded. The question in the present case is not whether the Pueblo has been impermissibly regulated by the state, as in the cited cases. *See e.g.*, *Wash. Dep't of Ecology*, 752 F.2d at 1468 (declining to decide whether, as in the present case, the state was "empowered to create a program reaching into Indian country when that reach is limited to non[]Indians"). Rather, the question is whether the state can require a nonmember to arrange with the Pueblo for remediation after the nonmember dumped solid waste in an unpermitted landfill on Pueblo land. HRV does not explain how the issues discussed in the cited cases relate to the different circumstances raised by the present case.

**{15}** The present circumstances are: (1) the evidence supports the hearing officer's finding that HRV participated in dumping at an unpermitted site on Pueblo lands; (2) the

Pueblo has consented to arranging with HRV for HRV to remediate the dump site; and (3) NMED has not ordered HRV to enter Pueblo lands. HRV does not apply the analyses offered by the cited cases to explain how these facts fit into the legal framework of federal, state, and tribal jurisdiction. *See Oneida Tribe of Indians*, 732 F.3d at 838-41 (considering the governing federal law and its application to the "not negligible" authority that a specific local government had to regulate particular tribal land and tribal members); *Indian Country U.S.A., Inc.*, 829 F.2d at 970, 981-83 (considering the state's authority to tax a bingo enterprise located on tribal land in light of "the series of federal laws enacted prior to statehood" and considering "that under certain circumstances a [s]tate may validly assert authority over the activities of nonmembers on a reservation, and in exceptional circumstances a [s]tate may assert jurisdiction over the on-reservation activities of tribal members" (omission, internal quotation marks, and citation omitted)).

**{16}** Utmost, HRV is concerned that absent express conditions for the required remediation in the compliance order, it will be forced to subject itself to the jurisdiction of the Pueblo, "without any assurance that it can obtain the ordered results, free of unreasonable terms that may be imposed by the Pueblo." NMED's order requiring HRV to make arrangements for remediation is authorized by Section 74-9-36(D), which in part permits NMED to "issue an order requiring corrective action, including corrective action beyond a solid waste facility's boundaries or such other response measure as [is deemed] necessary to protect human health or the environment." Further, Section 74-9-34(D) provides that

> [i]f any responsible party that is liable for a release or threatened release fails *without sufficient cause* to properly provide removal or remedial action upon order of the director, that person shall be liable to the state or the appropriate political subdivision for punitive damages in an amount at least equal to, and not more than three times the amount of, any costs incurred as a result of the failure to take proper action. The director is authorized to commence a civil action against any such person to recover the damages, which shall be in addition to any costs recovered from the person.

(Emphasis added.) Thus, should a party fail to provide for remediation and be subjected to a civil action for punitive damages, defenses remain available to that party regarding whether they "without sufficient cause . . . properly provide[d] removal or remedial action." *Id.* The authority cited by HRV does not demonstrate either that a state is required to tailor the parameters of a compliance order to ensure that a party who has violated state law by dumping solid waste on Pueblo land will not be subject to the jurisdiction of the Pueblo or that HRV has no recourse should the Pueblo impose unreasonable requirements for remediation. *See id.*

**{17}** For all of these reasons, we conclude HRV has not met the burden on appeal to demonstrate that the agency's decision "represents an abuse of the agency's discretion

by being outside the scope of the agency's authority." *See Regents of Univ. of N.M.*, 1998-NMSC-020, ¶ 17 (internal quotation marks and citation omitted).

## III.     The Penalty Assessment

**{18}**    The civil penalty assessment is authorized by Section 74-9-38, which permits a civil penalty for "[a]ny person" who violated the SWA, "not to exceed five thousand dollars ($5,000) for each day during any portion of which a violation occurs." HRV first contends that the compliance order did not explicitly identify HRV as the subject of the penalty calculation and that the evidence did not implicate HRV. Specifically, HRV argues that the penalty calculation did not provide notice to HRV of the basis for the penalty or any "analysis of economic benefit to HRV or any other basis for holding HRV responsible for the penalties." HRV points to no authority requiring NMED to demonstrate that HRV benefited economically, and we have already determined that the evidence supported the hearing officer's determination that HRV participated in the prohibited activity. We further conclude that the compliance order defines "Respondents" as both BL Santa Fe and HRV and assessed the penalty for "Respondents' four violations." HRV therefore had notice of the penalty assessment and the reasons for it, and we reject HRV's position to the contrary.

**{19}**    Second, HRV maintains that the hearing officer should have apportioned the liability for the penalty among BL Santa Fe, the Pueblo, and HRV. The final order requires HRV to pay only half of the civil penalty based on BL Santa Fe's settlement with NMED. HRV argues, without explanation, that it should be responsible for no more than 10 percent of the total fine. HRV invokes Section 74-9-34(E), which requires a court to apportion "an award of costs or damages, or both." That provision, however, must be read together with the previous provision, permitting the director to bring a civil action if a responsible party fails to remediate without good cause. *See* § 74-9-34(D). The time for apportionment under Section 74-9-34(E) has not yet, and may never, come. The imposition of half the assessed penalty is less than the maximum amount authorized by the statute, and HRV is "[a]ny person" who violated the SWA. The penalty assessment is therefore justified under Section 74-9-38.

**{20}**    To the extent HRV contends that the Pueblo should be required to pay a portion of the civil penalty, we see no statutory requirement for such. Despite HRV's position that the Pueblo misled HRV and BL Santa Fe to believe the dumping was authorized, the record contains no findings that would justify the imposition or apportionment of the civil penalty against the Pueblo or reduction of the penalty assessed against HRV. The four violations involved HRV's failure to register as a hauler of special waste, failure to manifest special waste, failure to sufficiently characterize special waste, and improper disposal of special waste at an unpermitted location. The first three violations did not involve the Pueblo and as to the fourth, HRV argues that a Pueblo official authorized and issued a certificate of disposal for the dumping. HRV contends that the Pueblo was paid for the dumping, though the record suggests that despite sending an invoice, the Pueblo asked that the bill not be paid. HRV points to no evidence that the Pueblo led HRV to believe that the site was a permitted location, which was the basis for the

violation. Whatever the Pueblo's involvement or infractions may have been, the evidence supported NMED's decision to assess the penalty against HRV as a person who violated the SWA. As a result, we conclude that the civil penalty is not contrary to law or discriminatory, as HRV suggests.

**CONCLUSION**

**{21}**    For the reasons stated herein, we affirm.

**{22}    IT IS SO ORDERED.**

**KATHERINE A. WRAY, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Judge**

**GERALD E. BACA, Judge**